EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Colegio de Médicos Veterinarios de Puerto Rico<br><br>Apelante<br><br>v.<br><br>Veterinario Express; Dr. Froilan Oliveras Tejeiro; Dra. Patricia N. Pabón Gautier; Dr. Yan F. Vélez Montalvo<br><br>Apelados | 2022 TSPR 113<br><br>210 DPR ____ |

Número del Caso: AC-2021-108

Fecha: 14 de septiembre de 2022

Tribunal de Apelaciones:

Panel Especial, TA 2021-016

Abogados de la parte apelante:

Lcdo. Jorge J. Sanabria García
Lcdo. Henry O. Freese Soufront
Lcda. Angélica Rivera Ramos

Abogado de la parte apelada
Dr. Froilán Oliveras Tejeiro:

Lcdo. Iván Díaz López

Oficina del Procurador General:

Lcdo. Omar Andino Figueroa
Subprocurador General

Lcda. Carmen A. Riera Cintrón
Procuradora General Auxiliar

Abogados de los *Amicus Curiae:*

    Colegio de Cirujanos Dentistas de Puerto Rico

        Lcdo. Pedro E. Ortiz Álvarez
        Lcdo. Jesús A. Rodríguez Urbano
        Lcdo. Edwin G. G. Ruiz Laboy
        Lcdo. Guillermo San Antonio Acha

    Colegio de Médicos Cirujanos de Puerto Rico

        Lcda. Verónica Ferraiuoli Hornedo

Materia: Sentencia de Tribunal con Opinión de Conformidad, Opinión Concurrente y Opinión Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Colegio de Médicos Veterinarios de Puerto Rico

       Apelante

         v.                  AC-2021-0108

Veterinario Express; Dr. Froilán Oliveras Tejeiro; Dra. Patricia N. Pabón Gautier; Dr. Yan F. Vélez Montalvo

       Apelados

SENTENCIA

En San Juan, Puerto Rico, a 14 de septiembre de 2022.

Atendido el recurso de Apelación, se confirma la Sentencia emitida por el Tribunal de Apelaciones, que confirmó el dictamen del foro primario. De ese modo, se sostiene el decreto de inconstitucionalidad de la colegiación compulsoria.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de Conformidad, a la que se unieron la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señor Kolthoff Caraballo y señor Feliberti Cintrón. El Juez Asociado señor Rivera García emitió una Opinión Concurrente. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión Disidente, a la que se unió el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Colón Pérez disintió e hizo constar la expresión siguiente:

> **La colegiación compulsoria se levanta sobre unos pilares de protección social.** Es por ello que, una vez más, nos vemos forzados a expresarnos sobre pronunciamientos de este Tribunal que derrotan tan nobles principios.

En la presente controversia -- una que inició con una demanda instada por el Colegio de Médicos Veterinarios de Puerto Rico en contra de Veterinario Express y varios de sus colegiados, entre ellos, el Dr. Froilán Oliveras Tejeiro, la Dra. Patricia N. Pabón Gautier y el Dr. Yan F. Vélez Montalvo, por presuntamente éstos haber incurrido en prácticas ilegales de la medicina veterinaria al emitir ciertos certificados de vacunación a mascotas que no habían sido vacunadas --, nos correspondía evaluar la constitucionalidad del requisito de colegiación compulsoria de la profesión médico-veterinaria dispuesto en la Sec. 5 de la *Ley del Colegio de Médicos Veterinarios de Puerto Rico*, Ley Núm. 107-1986, 20 LPRA sec. 2971a, frente al derecho de estos y estas profesionales a la libre asociación. En específico, debíamos determinar si la colegiación compulsoria era el medio menos oneroso para adelantar el interés apremiante del Estado de regular la profesión médico-veterinaria para proteger la salud, la seguridad y el bienestar público.

Recientemente, al enfrentarnos a una controversia muy similar a la que hoy nos ocupa, en *Rodríguez Casillas et al. v. Colegio*, 202 DPR 428 (2019) (Colón Pérez, opinión disidente), -- donde evaluamos la constitucionalidad del requisito de colegiación compulsoria de los y las profesionales de la industria automotriz --, resaltábamos:

> [L]a importancia histórica que han tenido los colegios profesionales en el desarrollo de nuestra sociedad. Estas instituciones no solo han defendido, y defienden, los intereses de los gremios que agrupan, sino también los de la ciudadanía en general.
>
> Por otra parte, los referidos colegios profesionales cumplen con la importante función de educar, tanto a la sociedad como a sus miembros, sobre los asuntos que atañen a su profesión. De igual forma, se aseguran de que quienes forman parte de su gremio mantengan sus conocimientos actualizados y cumplan con los requerimientos éticos que les rigen, **protegiendo así a la ciudadanía de ser víctimas de prácticas ilegales o un desempeño incompetente por parte de los profesionales a los que estas instituciones regulan.**

En esa dirección, [mencionábamos] que "[e]l establecimiento de [colegios profesionales] no tiene por objeto principal la satisfacción de los intereses profesionales, ni aún los colectivos de la profesión, sino la del interés público que pueda suponer el ejercicio de determinada profesión". J. Gálvez Montes, *La organización de las profesiones tituladas*, Madrid, Consejo de Estado y Boletín Nacional de Estado, 2002, pág. 50. Esto responde [señalábamos] a que, aunque la exigencia de una titulación funciona como garantía de que solo ejerzan una profesión aquellos que hayan acreditado tener los conocimientos necesarios, existen ciertas profesiones en las cuales -- por sus características particulares -- no basta dicha garantía para proteger el interés público. *Íd*. (Énfasis suplido).

Así pues, en esa ocasión, -- tras examinar cuidadosa y detenidamente los deberes y las funciones del colectivo objeto de análisis, reiterar la facultad del Estado para reglamentar el ejercicio de las profesiones al amparo de su poder de razón de estado y reconocer que el derecho a la libre asociación consagrado en nuestra Carta Magna no es absoluto --, concluimos que no existía un medio menos oneroso que la colegiación compulsoria de los y las profesionales de la industria automotriz para adelantar el interés apremiante del estado de regular dicha profesión. Es decir, validamos el requisito de colegiación compulsoria por entender que éste redundaba en el mejor beneficio de nuestro País y de todos los que aquí vivimos.

En el presente litigio, -- uno en el cual reafirmamos los pronunciamientos esbozados en nuestro disenso en *Rodríguez Casillas et al. v. Colegio*, *supra*, -- no podemos llegar a una conclusión distinta. Y es que, no podemos olvidar que el Colegio de Médicos Veterinarios de Puerto Rico tiene, entre sus sensitivos deberes, los siguientes:

(a) [c]ontribuir al adelanto y desarrollo de la ciencia y el arte de la medicina veterinaria estimulando el continuo desarrollo profesional del médico veterinario mediante la divulgación de conocimientos científicos.

(b) [e]levar y mantener la dignidad de la profesión y de sus miembros.

(c) [l]aborar por la implantación de leyes adecuadas que respondan a un espíritu razonable y justo y que tengan relación con la profesión del médico veterinario y defender la misma de cualquier ley perjudicial.

(d) [m]antener la estricta honradez y el alto grado de responsabilidad que caracterizan a esta profesión.

(e) [s]ostener y estimular un mayor sentido de comprensión entre el médico veterinario y los demás profesionales.

(f) [c]ontribuir al adelanto de la medicina veterinaria mediante la investigación científica.

[…]

(i) [c]ooperar con el mejoramiento de la práctica de la medicina veterinaria, velando en todo momento por la salud pública. […]. Sec. 7 de la Ley Núm. 107-1986, 20 LPRA sec. 2971c.

Asimismo, la Ley Núm. 107-1986, *supra*, establece que el Colegio de Médicos Veterinarios de Puerto Rico, entre otras facultades, será la entidad encargada de adoptar los reglamentos y cánones de ética profesional que regirán la conducta de los médicos-veterinarios. 20 LPRA sec. 2971d.

Siendo ello así, no albergamos duda alguna que el Colegio de Médicos Veterinarios de Puerto Rico ejerce un rol fundamental para mantener y asegurar los más altos estándares en la profesión de referencia, la cual ha cobrado mayor relevancia a través de los años por ser éstos y éstas las personas encargadas de velar por la salud y el bienestar de quienes nos brindan afecto, diversión, protección y compañía: nuestras mascotas. Recordemos que, en estos tiempos en que vivimos,

para muchas familias puertorriqueñas[,] sus mascotas han pasado a ser una parte esencial en su diario vivir. Actualmente[,] esta conexión entre humanos y mascotas es más común, ya que la percepción de la sociedad hacia los

animales ha evolucionado. Estos antes se utilizaban para realizar labores y ahora son un miembro más en el entorno familiar. Incluso, muchas personas los consideran como a un hijo. Esta relación afectiva que crece entre ambos seres vivos lleva a muchos guardianes a preocuparse por la salud de sus mascotas. Es por esta razón que los guardianes acuden a los médicos veterinarios para que[,] con la medicina moderna[,] ayuden a que la vida de sus animales sea una prolongada y saludable. Como podemos ver[,] esta necesidad que ha crecido entre las personas de mantener a sus mascotas sanas[,] ha [provocado] que cada día aumenten las interacciones entre los médicos veterinarios y los animales. M. González Alcántara, *Una propuesta para casos de impericia veterinaria: reconociendo a los animales como sujetos de derechos*, 53 Rev. Jur. U. Inter 371 (2019).

La realidad antes descrita, -- es decir, esa búsqueda de la salud y seguridad de nuestras mascotas -- ha sido, por ejemplo, incorporada en nuestro ordenamiento jurídico en el recién aprobado Código Civil de Puerto Rico donde se les reconocieron ciertos derechos a los animales domésticos y a los domesticados. Véase, Título II del Código Civil de Puerto Rico, Ley Núm. 55-2020, 31 LPRA sec. 5951-5954. Esto tuvo como objetivo la promoción de un trato digno y justo para estos seres vivientes, la protección y preservación de su vida, alimentación, así como los cuidados veterinarios y de salud. Exposición de Motivos del Código Civil de Puerto Rico, Ley Núm. 55-2020 (2020 [Parte 1] Leyes de Puerto Rico, 602). Por igual, con el referido estatuto legal se procuró fomentar el afecto de sus personas custodias y colocar a Puerto Rico a la vanguardia de las legislaciones protectoras de los animales. *Íd.*

Así pues, y en vista de estos nuevos escenarios y de la importante función que desempeña el Colegio de Médicos Veterinarios de Puerto Rico, para adelantar los postulados antes reseñados, somos del criterio que el derecho de sus miembros a no asociarse debió ceder ante los intereses que adelantaba la colegiación compulsoria. A todas luces, los principios de protección social que bien cumple dicha entidad son de mayor jerarquía a cualquier inquietud particular -- o molestia momentánea -- de un miembro del mencionado gremio.

Es, pues, por todo lo antes expuesto, que respetuosamente disentimos del curso de acción seguido por mis compañeros y compañera de estrado en el día de hoy.



Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Colegio de Médicos
Veterinarios de Puerto Rico

        Apelante

        v.

Veterinario Express; Dr.
Froilán Oliveras Tejeiro;
Dra. Patricia N. Pabón
Gautier; Dr. Yan F. Vélez
Montalvo

        Apelados

AC-2021-0108

Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la que se unieron la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señor Kolthoff Caraballo y señor Feliberti Cintrón.

En San Juan, Puerto Rico, a 14 de septiembre de 2022.

Lamentablemente, en esta ocasión este Tribunal no llegó a un consenso con relación a la inconstitucionalidad de la colegiación compulsoria. Lo anterior refleja un distanciamiento del precedente que habíamos establecido en Rivera Schatz v. ELA y C. Abo. PR II, infra y Rodríguez Casillas et al. v. Colegio, infra. Las consecuencias de esta actuación limitan nuestra oportunidad para seguir pautando una norma clara con respecto al derecho a la libertad de asociación que ostentan nuestros profesionales.

La única controversia ante nuestra consideración era la constitucionalidad de la colegiación compulsoria de la profesión médico-veterinaria. Ante

nuestra consideración no estaba el diseño del esquema regulador de la profesión de los médicos veterinarios. Es decir, una determinación de inconstitucionalidad de la colegiación compulsoria implica solamente el surgimiento de una colegiación voluntaria. Lo anterior solo elimina el factor obligatorio de la colegiación sin alterar el esquema regulador de la profesión médico-veterinaria, a pesar de preocupaciones que puedan expresar algunos de nuestros integrantes que, en realidad, no están ante nuestra consideración. Si ese marco regulatorio ha sido viable hasta ahora, no hay razón alguna para pensar que no lo seguirá siendo. Sostener lo contrario implicaría presumir que el establecimiento de una colegiación voluntaria acabaría con todo el esquema regulador que aprobó la Asamblea Legislativa. El esquema regulador no se basa en la colegiación compulsoria, sino en la facultad que tiene la Junta Examinadora para establecer los criterios de admisión y licencia para la práctica de la medicina veterinaria.

De esta manera, nuestra facultad se limitaba a dilucidar si existe una medida para adelantar el interés del Estado al regular la profesión médico-veterinaria y que, a diferencia de la colegiación compulsoria, restrinja menos el derecho constitucional de libre asociación que tienen estos profesionales. Contesto esa interrogante en la afirmativa y, por consiguiente, voto para confirmar el dictamen del Tribunal de Apelaciones que resolvió que la colegiación compulsoria de los veterinarios es inconstitucional.

I

La controversia ante nos tiene su inicio en la presentación de una demanda por parte del Colegio de Médicos Veterinarios de Puerto Rico (Colegio) contra Veterinarios Express y los doctores veterinarios Frailán Oliver Tejeiro, Yan F. Vélez Montalvo y Patricia N. Pabón Gautier. Allí, el Colegio alegó que estos últimos incurrieron en prácticas ilegales de la medicina veterinaria, al ignorar los procedimientos requeridos para llevar a cabo vacunaciones en masa, con el riesgo de que se emitan certificados de vacunas a mascotas que nunca fueron vacunadas. En vista de lo anterior, solicitó que se emitiera una orden de injunction preliminar y permanente para prohibirle a los demandados que continuaran con las prácticas supuestamente ilegales.

En vista de lo anterior, los demandados contestaron la demanda. Además, el Dr. Oliveras Tejeiro presentó una reconvención, en la que solicitó que se emitiera una sentencia declaratoria mediante la cual se declarara inconstitucional la membresía compulsoria en el Colegio como condición para practicar la profesión médico-veterinaria.

Ante este cuadro procesal, el Tribunal de Primera Instancia emitió una *Resolución y Orden* en la que le ordenó al Secretario de Justicia que compareciera a expresar la postura del Estado. En cumplimiento con lo ordenado, el Departamento de Justicia compareció en representación del Estado mediante una moción de sentencia sumaria. Sostuvo que no es constitucionalmente permisible que se imponga la

colegiación compulsoria en detrimento del derecho a la libre asociación, a menos que se articule la existencia de un interés apremiante y se pruebe que el Estado no tenía una medida menos restrictiva que la legislada para lograr dicho interés. Concluyó que, como en este caso, cualquier disposición legal que imponga un requerimiento de colegiación o membresía a cualquier entidad como requisito para el ejercicio de una profesión regulada por una junta examinadora en virtud de ley, es inconstitucional conforme a lo establecido en Rodríguez Casillas et al. v. Colegio, infra. Por su parte, el Dr. Oliveras Tejeiro sometió un escrito, mediante el cual adoptó por referencia y acogió como propio lo expresado por el Estado en su comparecencia.

Por otro lado, el Colegio presentó una oposición a la moción de sentencia sumaria. Como primer punto, indicó que la moción de sentencia sumaria presentada por el Estado no cumplió con los requisitos esbozados en las Reglas de Procedimiento Civil. Argumentó que, conforme a la Doctrina de Separación de Poderes, no es constitucionalmente válido que un tribunal pretenda imponerle su criterio a la Asamblea Legislativa sobre cómo regular las profesiones, salvo la abogacía. Por último, arguyó que la colegiación compulsoria del Colegio no incide sobre el derecho de no asociación de los médicos veterinarios, a la luz de la jurisprudencia federal.

Examinada la postura de ambas partes, el foro primario declaró con lugar la reconvención y dictó una sentencia

declaratoria decretando la inconstitucionalidad de la colegiación compulsoria de los médicos veterinarios.

Luego de que el Colegio sometió una reconsideración que fue denegada, presentó una apelación ante el Tribunal de Apelaciones. En esencia, señaló que el Tribunal de Primera Instancia erró al decretar la inconstitucionalidad de la colegiación compulsoria. En apoyo, reprodujo los argumentos esbozados en su oposición a la moción de sentencia sumaria.

Examinado el recurso y las posturas del Dr. Oliveras Tejeiro y el Estado, el Tribunal de Apelaciones dictó una sentencia en la que confirmó la determinación del foro primario. Indicó que tanto la moción de sentencia sumaria como su oposición, cumplieron con las Reglas de Procedimiento Civil. Sostuvo que no existen hechos en controversia y lo que procedía era aplicar el derecho. Así, el foro apelativo indicó que no hay controversia en cuanto al interés apremiante del Estado en regular la profesión médico-veterinaria. Sin embargo, concluyó que no es necesaria la limitación del derecho de asociación para salvaguardar dicho interés. Razonó que al contraponer las facultades del Colegio con las de la Junta Examinadora de Médicos Veterinarios, existe una medida menos restrictiva, esto es la facultad de regulación sobre la profesión que ejerce la Junta Examinadora. Además, sostuvo que la inconstitucionalidad de la colegiación compulsoria no implica que el Colegio no pueda continuar ejerciendo sus facultades por medio de una matrícula voluntaria. Por

último, sostuvo que es innecesario atender los reclamos del Colegio de atemperar el análisis sobre la constitucionalidad de la colegiación compulsoria a la normativa federal. Entendió que luego de <u>Rodríguez Casillas et al. v. Colegio</u>, <u>infra</u>, no hay duda de cuál es el escrutinio aplicable a este caso.

Luego de presentar una reconsideración que fue denegada, el Colegio presentó una apelación ante este Tribunal. En esta señaló que el Tribunal de Apelaciones erró al dictar sentencia sumaria en contravención con las Reglas de Procedimiento Civil. Además, señaló que el foro apelativo, en su análisis sobre la constitucionalidad de la colegiación compulsoria, no consideró que se requiere la existencia de una medida menos restrictiva que tenga la misma efectividad que la adoptada por el Estado al establecer la colegiación compulsoria.

Luego de varios trámites procesales, las partes presentaron sus respectivos alegatos. Además, el 17 de marzo de 2022, emitimos una *Resolución* en la que permitimos que el Colegio de Cirujanos Dentistas de Puerto Rico y el Colegio de Médicos Cirujanos de Puerto Rico comparecieran como *amici curiae*, y así lo hicieron.

Expedido el recurso, con el beneficio de la comparecencia de las partes y de los *amici curiae*, procedo a atender la controversia.

II

A

Nuevamente teníamos ante nuestra consideración la constitucionalidad del requisito de colegiación compulsoria para pertenecer a una profesión. En específico, si la colegiación compulsoria de la profesión médico-veterinaria es el medio menos oneroso para adelantar los fines que esta persigue.

Hemos reconocido que, en el ejercicio del poder de razón de Estado, la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones, salvo la jurídica. Rodríguez Casillas et al. v. Colegio, 202 DPR 428, 440 (2019); Accurate Sols. v. Heritage Environmental, 193 DPR 423, 434 (2015); Matos v. Junta Examinadora, 165 DPR 741, 755 (2005). De esta manera, hemos indicado que el "Estado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otro que esté racionalmente relacionado con el objetivo de garantizar que los examinados posean la competencia para practicar la profesión en forma adecuada". Marcano v. Departamento Estado, 163 DPR 778, 786 (2005). Ahora bien, en este proceder, el Estado no puede coartar el derecho a asociarse o a no asociarse, a menos que no haya medida menos restrictiva para lograr sus objetivos legítimos. Rodríguez Casillas et al. v. Colegio, supra, pág. 433.

Mediante la Ley Núm. 107 de 10 de julio de 1986, según enmendada, conocida como la Ley del Colegio de Médicos Veterinarios de Puerto Rico, 20 LPRA sec. 2971 et seq. (Ley

Núm. 107), se autorizó la creación de ese Colegio. Así en la Sec. 1 de la Ley Núm. 107, supra, 20 LPRA sec. 2791, se dispone que:

> Por este capítulo se constituye a todas las personas con licencia para ejercer la profesión de médico veterinario en Puerto Rico, siempre que la mayoría de ellos así lo acuerden en referéndum que al efecto se celebrará según se dispone más adelante, en entidad jurídica bajo el nombre de "Colegio de Médicos Veterinarios de Puerto Rico", con domicilio en San Juan, Puerto Rico.

Luego de que una mayoría lo acordara, y después de noventa días de celebrada la Asamblea General Constituyente y electa la primera Junta de Gobierno del Colegio de Médicos Veterinarios de Puerto Rico, "ningún médico veterinario que no sea miembro del Colegio podrá ejercer su profesión en Puerto Rico. . .", y si la ejerciera estará sujeto a penalidades. Sec. 5 de la Ley Núm. 107, supra, 20 LPRA sec. 2971a.

La Asamblea Legislativa hizo constar el propósito para la aprobación de la Ley Núm. 107, supra, en su Exposición de Motivos:

> La Medicina Veterinaria es una de esas profesiones que todos los años se ve amenazada por individuos graduados de instituciones no reconocidas. Favorecer a un grupo de no cualificados que perjudican a toda una profesión, a muchos estudiantes que hoy se preparan en las mejores universidades y menoscabando la calidad de servicios que se ofrecen a nuestro pueblo, decididamente no es la forma de forjar un Puerto Rico mejor.
> La Legislatura, consciente de su responsabilidad para salvaguardar la salud de nuestro pueblo, su nivel intelectual y cultural, y el mejoramiento científico de nuestras industrias, aprueba esta ley.

Cónsono con lo anterior, al Colegio se le delegaron los deberes siguientes:

(a) Contribuir al adelanto y desarrollo de la ciencia y el arte de la medicina veterinaria estimulando el continuo desarrollo profesional de médico veterinario mediante la divulgación de conocimientos científicos.

(b) Elevar y mantener la dignidad de la profesión y de sus miembros.

(c) Laborar por la implantación de leyes adecuadas que respondan a un espíritu razonable y justo y que tengan relación con la profesión del médico veterinario y defender la misma de cualquier ley perjudicial.

(d) Mantener la estricta honradez y el alto grade [(sic)] de responsabilidad que caracterizan a esta profesión.

(e) Sostener y estimular un mayor sentido de comprensión entre el médico veterinario y los demás profesionales.

(f) Contribuir al adelanto de la medicina veterinaria mediante investigación científica.

(g) Determinar medidas de protección mutua, estrechando los lazos de amistad y compañerismo entre los miembros que lo constituyen.

(h) Suministrar los informes pertinentes que el Gobierno solicite.

(i) Cooperar con el mejoramiento de la práctica de la medicina veterinaria, velando en todo momento por la salud pública.

(j) Establecer relaciones con asociaciones análogas de otros países, dentro de determinadas reglas de solidaridad y cortesía. Sec. 7 de la Ley Núm. 107, _supra_, 20 LPRA sec. 2971c.

Además, al Colegio se les concedieron las siguientes facultades:

(a) Subsistir a perpetuidad bajo este nombre.

(b) Demandar y ser demandado como persona jurídica.

(c) Poseer y usar un sello que podrá alterar a su voluntad.

(d) Adquirir derechos y bienes, tanto muebles como inmuebles, por donación, legado, tributo entre sus propios miembros, compra o de otro modo; y poseerlos, traspasarlos, hipotecarlos, arrendarlos y disponer de los mismos en cualquier forma.

(e) Nombrar a sus directores, funcionarios y oficiales.

(f) Adoptar su reglamento, que será obligatorio para todos sus miembros y para enmendar aquél, en la forma y bajo los requisitos que en el mismo se estatuyan.

(g) Proteger a sus miembros en el ejercicio de su profesión, mediante la creación de montepíos, sistemas de seguros y fondos especiales, o en cualquier otra forma, socorrer a aquellos que se retiren por incapacidad física o edad avanzada o que sufran accidentes o que se enfermen y sus herederos o beneficiarios de los que fallezcan.

(h) Recibir e investigar las quejas juradas que se formulen respecto a la conducta de los miembros en el ejercicio de la profesión y violaciones a este capítulo, pudiendo remitirlas a la Junta de Gobierno para que actúe, y después de una vista preliminar en la que se le dará la oportunidad al interesado o a su representante, si encontrara causa fundada, instituir el correspondiente procedimiento de disciplina del afectado. **Nada de lo dispuesto en este inciso se entenderáen [(sic)] el sentido de limitar o alterar la facultad de la Junta Examinadora de Médicos Veterinarios que podrá por su propia cuenta iniciar investigaciones en relación a [(sic)] violaciones tanto a este capítulo como de las secs. 2951 et seq. de este título, al igual que recibir e investigar quejas respecto a la conducta de los miembros en ejercicio de la profesión.**

(i) Ejercitar a las facultades incidentales que fueren necesarias o convenientes a los fines de su creación y funcionamiento que no estuvieren en desacuerdo con lo dispuesto en este capítulo.

(j) Adoptar o implantar los cánones de ética profesional que regirán la conducta de los médicos veterinarios.

(k) Asumir la representación de todos los médicos veterinarios autorizados por la Junta Examinadora de Médicos Veterinarios para ejercer la profesión en Puerto Rico y para hablar en nombre y representación de los mismos, de acuerdo con los términos de este capítulo y del reglamento que se aprobare.

(l) Establecerá cursos de educación continua para los miembros del Colegio de Médicos Veterinarios de Puerto Rico. (Énfasis nuestro) Sec. 8 de la Ley Núm. 107, supra, 20 LPRA sec. 2971d.

Además de que los miembros están sujetos a suspensión si no pagan la cuota de colegiación, Sec. 13 de la Ley Núm. 107, 20 LPRA sec. 2971i, se dispuso en la ley que la persona

que ejerza la profesión médico veterinaria, o que se anuncie o se haga pasar por médico veterinario sin estar colegiado, "será castigad[a] con multa no menor de cien dólares ($100) ni mayor de quinientos dólares ($500), o cárcel por un término no menor de dos (2) meses ni mayor de (4) meses, o ambas penas a discreción del tribunal". Sec. 15 de la Ley Núm. 107, supra, 20 LPRA sec. 2971k. De hallársele incurso en la misma conducta en ocasiones subsiguientes, "será castigad[a] con reclusión por un término no menor de cuatro (4) meses ni mayor de seis (6) meses o con multa de cien dólares ($100) ni mayor de quinientos dólares ($500) o ambas penas a discreción del tribunal". Íd. Además, "la sentencia constituirá causa suficiente para la revocación por la Junta Examinadora de Médicos Veterinarios de la licencia que le fuere expedida". Íd.

En atención a que la colegiación de la profesión médico-veterinaria es compulsoria corresponde auscultar el efecto que el derecho a la libre asociación tiene sobre este requisito.

B

Hemos expresado que la colegiación compulsoria de una clase profesional es una institución en conflicto con el derecho de libertad de asociación de sus integrantes. Rodríguez Casillas et al. v. Colegio, supra, pág. 448. Este derecho se recoge en la Constitución de Puerto Rico de manera expresa, a diferencia de la Constitución federal. Así se dispone que "[l]as personas podrán asociarse y organizarse

libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 299. Véase, además, Escuela de Administración Pública de la Universidad de Puerto Rico, La nueva Constitución de Puerto Rico, Río Piedras, EDUPR, 1954, pág. 225.

La Constitución de Puerto Rico es moderna y más abarcadora que otras constituciones clásicas, como la de Estados Unidos. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 11. A esos efectos el Profesor Álvarez González ha dicho que:

> Aunque la influencia de la Constitución federal es patente, en la Constitución de Puerto Rico se evidencia una importante influencia de la Declaración Universal de los Derechos del Hombre, proclamada por las Naciones Unidas.
> . . . . . . . .
> La Constitución de Puerto Rico es más moderna y mas [(sic)] detallista que la federal. Muchos aspectos de nuestra Constitución no están cubiertos en la federal, sino en leyes federales (*e.g.*, Juez Presidente administra los tribunales; poder del Tribunal Supremo para adoptar reglas procesales; Contralor).
> Nuestra Constitución consagra expresamente en su Carta de Derechos, derechos constitucionales que la Constitución de Estados Unidos no consagra expresamente o que sólo admite imperfectamente la jurisprudencia federal.... Íd.

En atención a este desarrollo histórico, hemos hecho referencia a la Declaración Universal de Derechos Humanos de las Naciones Unidas para complementar nuestro análisis del derecho a la libre asociación reconocido en la Constitución de Puerto Rico. Con relación a este derecho, el referido documento dispone que "[t]oda persona tiene derecho a la

libertad de reunión y de asociación pacíficas" y que "[n]adie podrá ser obligado a pertenecer a una asociación". Art. 20 de la Declaración Universal de Derechos Humanos. De manera similar, en Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 811-812 (2014), concluimos que "el derecho a la libre asociación necesariamente presupone el derecho de las personas a no asociarse".

En vista de ese historial, hemos reconocido que el estándar aplicable a controversias que versen sobre el derecho fundamental a la libre asociación es el de escrutinio estricto. Luego de que se desaprovechara la oportunidad en Colegio de Abogados de P.R. v. Schneider, 112 DPR 540 (1982), en Col. de Abogados v. E.L.A., 181 DPR 135, 137 (2011), expresamos que una "limitación significativa de la libertad a no asociarse es constitucional **solamente si el Estado demuestra un interés gubernamental apremiante que la hace necesaria**". (Énfasis nuestro). Véase, también, H.R. Ramos Díaz & C.J. Saavedra Gutiérrez, Libertad de Asociación y Colegiación Compulsoria: Una propuesta del estándar constitucional aplicable, 1 Rev. Jur. AAPR 23, 37-38 (2013). Aún más claro nos expresamos en Rivera Schatz v. ELA y C. Abo. PR II, supra, págs. 813-814, en cuanto al estándar aplicable para dilucidar controversias de derecho a la libre asociación. Indicamos:

> [C]uando con su proceder el Estado menoscaba un derecho fundamental este **tiene que articular la existencia de un interés apremiante que justifique la necesidad de su actuación**. Además, tal como hemos reconocido con otros derechos fundamentales, **será necesario que el Estado demuestre que no**

**tenía a su alcance medidas menos onerosas que la legislada para lograr el interés articulado.** Solo de esa manera se protege adecuadamente un derecho tan fundamental como el de la libertad de asociación. Además, y conforme al historial que hemos discutido, respetamos la preeminencia que los constituyentes quisieron impartir a este derecho al reconocerlo explícitamente en nuestro documento constitucional. (Énfasis nuestro).

Examinado el estándar correspondiente a controversias en las que está inmiscuido el derecho a la libre asociación, corresponde determinar si la profesión médico-veterinaria cuenta con una medida menos restrictiva que la colegiación compulsoria para adelantar los fines que esta última persigue.

C

En el ejercicio del poder de razón de Estado, y previo a la creación del Colegio de Médicos Veterinarios, la Asamblea Legislativa aprobó la Ley Núm. 194 de 4 de agosto de 1979, según enmendada, conocida como la Ley del Ejercicio de la Medicina Veterinaria de Puerto Rico, 20 LPRA sec. 2951 et seq. A través de la Ley Núm. 194 se creó la Junta Examinadora de Médicos Veterinarios, con el propósito de que esta regule la profesión médico-veterinaria. Esta ley, a su vez, fue enmendada por la Ley Núm. 187 de 28 de diciembre de 2001. En la Exposición de Motivos de la Ley Núm. 187 se expresó lo siguiente:

Se adopta esta Ley en el pleno de la facultad del Estado para promover la salud, la seguridad y el bienestar público mediante la protección del pueblo contra el ejercicio impropio de la medicina veterinaria en Puerto Rico.

Por la presente se declara que el ejercicio de la medicina veterinaria es un derecho que el poder legislativo confiere a aquellas personas dotadas de las cualificaciones académicas y profesionales que se describen en esta Ley.

La profesión médico-veterinaria es de vital importancia para la salud de los animales para la salud de un pueblo, ya que los médicos-veterinarios son responsables por la salud de los animales utilizados para producir alimentos de consumo por los humanos y se responsabilizan también por los animales que nos brindan afecto, solaz, protección y compañía.

La Tecnología Veterinaria es una rama dentro del ámbito de la Medicina Veterinaria que se ha desarrollado en los últimos años y que aporta efectivamente el equipo de prestación de servicios veterinarios. Por estar íntimamente ligada a las funciones que lleva a cabo el Médico Veterinario es pertinente tomar acción para reglamentar la misma. Siguiendo el modelo experimentado de otras jurisdicciones se propone la creación de una Subjunta de Tecnología Veterinaria adscrita a la Junta Examinadora de Médicos Veterinarios de Puerto Rico.

Esta Ley amplía y actualiza la definición del ejercicio profesional de la medicina veterinaria, provee una mejor definición de lo que es una escuela acreditada o de lo que es una escuela no acreditada y las normas de acreditación, explica la relación veterinario-paciente-cliente, aclara aspectos operacionales de la Junta Examinadora de Médicos Veterinarios y de la forma de preparar y administrar el examen de reválida, otorga a las autoridades correspondientes los mecanismos para promover una acción legal mediante tribunal competente y así evitar que individuo alguno que no cumpla con lo estipulado en esta Ley pueda ejercer ilícitamente la medicina veterinaria.

Se crea en esta Ley la Subjunta Examinadora de Tecnología Veterinaria para que promulgue la reglamentación que regirá a los Tecnólogos y Técnicos Veterinarios.

A los efectos de actualizar la vigente Ley Núm. 194 de 4 de agosto de 1979, según enmendada, en distintos aspectos de contenido académico, clínico y administrativo, se establecen claramente por este medio los criterios y requisitos para obtener una licencia de médico-veterinario en

Puerto Rico y de tecnólogo o técnico veterinario en Puerto Rico. Se ha ponderado, para adoptar dichos criterios y exigencias, las condiciones que deben prevalecer en Puerto Rico tanto en la salud animal como en la salud pública.

En atención a lo anterior, el Art. 4 de la Ley Núm. 194, supra, 20 LPRA sec. 2956, le otorgó a la Junta Examinadora la facultad para:

(a) Examinar y evaluar las calificaciones morales y académicas de cada solicitante a examen de reválida conducente a la licencia para ejercer la medicina veterinaria en Puerto Rico, inclusive mediante entrevista personal con el solicitante.

(b) Emitir, renovar, denegar, suspender y revocar licencias permanentes y provisionales para el ejercicio de la medicina veterinario en Puerto Rico, así como tomar medidas disciplinarias, en relación con los tenedores de dichas licencias, que sean consistentes con este capítulo y con los reglamentos promulgados al amparo del mismo. Disponiéndose, además, que, en conjunto con la Subjunta, emitirá las licencias para tecnólogos veterinarios y técnicos veterinarios.

. . . . . . . .

(j) Establecer por reglamento los requisitos y procedimientos para recertificación de los médicos veterinarios cada tres (3) años según requerido en las secs. 3001 et seq. del Título 24.

Cónsono con lo anterior, según los Arts. 14 y 14.1 de la Ley Núm. 194, supra, 20 LPRA secs. 2963 y 2963(a), la Junta Examinadora posee la facultada para revocar, suspender o denegar una licencia. Así:

Si se radicase por cualquier persona una querella escrita y jurada contra el tenedor de una licencia, y si la Junta o Subjunta, según sea el caso, determinase que dicha querella plantea hechos que levantan una duda razonable sobre si el querellado ha incurrido o no en conducta impropia según lo dispuesto por este capítulo, la Junta o Subjunta celebrará una audiencia pública siguiendo

> el procedimiento delineado en las secs. 9601 et seq. del Título 3, y por mayoría simple de sus miembros podrá revocar o suspender por determinado tiempo la licencia de un médico, técnico o tecnólogo veterinario o tomar cualquier otra acción disciplinaria según se disponga en el reglamento interno de la Junta o Subjunta. . . . Art. 14 de la Ley Núm. 194, supra.

En este sentido, la Junta Examinadora está facultada para revocar o suspender una licencia a consecuencia de "[l]a incompetencia, negligencia crasa o tratamiento erróneo (*malpractice*) en el ejercicio de la medicina veterinaria o la tecnología veterinaria, según sea el caso". Íd. Igualmente, la Junta Examinadora "podrá denegar la expedición de una licencia luego de notificación a la parte interesada y darle oportunidad de ser oída. . .". Art. 14.1 de la Ley Núm. 194, supra.

Por otro lado, la Junta Examinadora, a tenor con las facultades que le delegó la Ley Núm. 194, supra, aprobó el Reglamento de Educación Continua y Registro para la Recertificación de los Médicos Veterinarios, Reglamento Núm. 3622 del Departamento de Salud de 16 de junio de 1988 (Reglamento Núm. 3622). Esto tuvo el propósito de establecer "los requisitos y procedimientos para la recertificación de los Médicos Veterinarios licenciados a base del cumplimiento del requisito de educación continua y su participación en el Registro de Profesionales . . .". Íd., Cap. III, Art. I, pág. 3. Mediante este Reglamento, la Junta Examinadora estableció las reglas para el ofrecimiento de la educación continua de los médicos veterinarios. De esa manera, procura

que, "adquieran, mantengan o desarrollen los conocimientos y destrezas necesarias para el desempeño de sus funciones dentro de los más altos niveles de competencia profesional". Íd., Cap. IV, Art. I, sec. 4.8, pág. 4.

Por último, conforme al Reglamento Núm. 3622, la frase proveedor de educación continua "se refiere al Colegio de Médicos Veterinarios de Puerto Rico". Íd., Cap. IV, Art. I, sec. 4.7, pág. 4. Sin embargo, allí también se indica que también son proveedores de educación continua "las organizaciones profesionales (colegio o asociación) e instituciones educativas acreditadas que han sido designadas por el Secretario de Salud para ofrecer cursos de educación continua a los Médicos Veterinarios". Íd.

D

En primer lugar, procede atender los planteamientos de índole jurisdiccional y procesal presentados por el Colegio.

Este argumenta que declarar inconstitucional la colegiación compulsoria al mismo tiempo que se declara que la Junta Examinadora es la medida menos restrictiva para adelantar el interés apremiante del Estado, equivale a que el tribunal sustituya el criterio de la Asamblea Legislativa por el suyo, en violación de la Doctrina de Separación de Poderes. El razonamiento anterior es simplemente incorrecto, e ignora la facultad de revisión judicial que se ha reconocido por más de doscientos años tras la decisión del Tribunal Supremo federal en Marbury v. Madison, 5 US 137 (1803). Al declarar inconstitucional una ley o una

disposición de esta, un tribunal no impone su criterio sobre el de la Asamblea Legislativa, sino que contrapone el criterio expresado en la Constitución al de las leyes aprobadas. Esto es parte de nuestra función como intérpretes de la ley. Senado de PR v. ELA, 203 DPR 62, 83-86 (2019). En cambio, la Asamblea Legislativa no puede imponer su criterio por encima de la Constitución.

Por otra parte, el Colegio hace unos señalamientos en cuanto a deficiencias de forma en la moción de sentencia sumaria del Estado. Estos defectos no existen. No existe controversia de hechos en este caso, por lo que solo resta aplicar el derecho. Esto es, la controversia acerca de la constitucionalidad de la colegiación compulsoria de la profesión médico-veterinaria se presentó adecuadamente.

Corresponde evaluar, entonces, si el Estado promueve un interés apremiante con la aprobación de la colegiación compulsoria y si esa medida es la menos restrictiva para adelantar ese interés. Adelanto que, aunque el Estado promueve un interés apremiante de salud pública, la colegiación compulsoria no es la medida menos restrictiva para conseguirlo.

En este caso existe una medida menos restrictiva para adelantar los intereses del Estado en promover la salud del Pueblo, esta es, la regulación de la profesión médico-veterinaria a través de la Junta Examinadora. Como expresamos, es esta entidad la que se encarga de admitir, renovar y suspender o revocar las licencias para poder

practicar la profesión médico-veterinaria. Este ejercicio lo hace a través de la evaluación de la competencia de los aspirantes a veterinario y de los miembros de la profesión, a través del ofrecimiento de exámenes de reválida, Art. 9 de la Ley Núm. 194, supra, 20 LPRA sec. 2959, o a través de la reciprocidad que la Junta Examinadora le puede dar a las licencias que otorgan las Juntas de otras jurisdicciones que administran exámenes, Art. 10 de la Ley Núm. 194, supra, 20 LPRA sec. 2960. También se logra el objetivo público a través de la recertificación de los médicos veterinarios, y los requisitos de educación continua, según la Junta Examinadora reguló este renglón en el Reglamento Núm. 3622, supra.

En Rodríguez Casillas *et al.* v. Colegio, supra, discutimos la importancia que este foro le ha reconocido a las juntas examinadoras. Allí, citamos a Román v. Trib. Exam. de Médicos, 116 DPR 71, 79 esc. 5 (1985), en donde indicamos los beneficios de una junta examinadora:

> En primer lugar, en la sociedad urbana moderna … las agencias gubernamentales se responsabilizan de asegurar que las personas encargadas de la salud y el bienestar públicos tengan el conocimiento y la competencia adecuados. **Esto sólo puede lograrse definiendo las condiciones de admisión a las ocupaciones y la permanencia en las mismas.** (Énfasis nuestro).

En este sentido, las juntas examinadoras son entes que facilitan la comunicación entre los profesionales de la industria de servicios y el cliente. Así, al discutir los fundamentos de los esquemas de licencia ocupacional, Robinson nos indica lo siguiente:

> Las licencias ocupacionales pueden considerarse
> especialmente necesarias cuando los consumidores
> son vulnerables debido a las asimetrías en la
> información, la capacidad o el poder, o si la falta
> de prestación competente de un servicio puede
> tener consecuencias particularmente nefastas. Por
> ejemplo, una justificación principal para otorgar
> licencias a los profesionales médicos se debe a la
> información percibida y las asimetrías de
> capacidad y las consecuencias potencialmente
> significativas de una atención inadecuada para la
> salud. (Traducción nuestra) Nick Robinson, The
> Multiple Justifications of Occupational
> Licensing, 93 Walsh. L. Rev. 1903, 1936 (2018).[1]

No obstante, el Colegio argumenta que persigue funciones adicionales a las que ejerce la Junta Examinadora. Sin embargo, al mismo tiempo indica en su alegato que "el legislador entendió indispensable crear al [Colegio] para **complementar** a la Junta [Examinadora] y **servir de brazo** al Estado, no solo para regular la profesión, sino también para velar por la salud de Nuestro Pueblo". (Énfasis nuestro). Alegato de la parte apelante, pág. 15. En efecto, entendemos que son acertadas las expresiones del Colegio, a los efectos de que son un ente que complementa a la Junta Examinadora, como lo podría complementar una universidad o cualquier otra organización que se dedique al adelanto de la medicina veterinaria. Sin embargo, no es obligatorio pertenecer a ninguna de esas organizaciones para tener una licencia. En cuanto a que el Colegio no existe solo para regular la

---

[1] Texto original:

*Occupational licensing may be viewed as especially necessary where consumers are vulnerable because of asymmetries in information, capacity, or power, or if failure to competently provide a service can have particularly dire consequences. For example, a primary justification of licensing medical professionals is because of perceived information and capacity asymmetries and the potentially significant health consequences of improper care.*

profesión, sino también para velar por la salud del Pueblo, es muy difícil pensar, mucho más argumentar, cómo la regulación de la profesión médico-veterinaria por parte de la Junta Examinadora no implica, a su vez, velar por la salud del Pueblo.

Por otro lado, el Colegio sostiene que la Junta Examinadora no es una medida menos restrictiva, pues no sustituye ciertas funciones que el Colegio lleva a cabo. De entrada, el Colegio confunde lo que se requiere demostrar para que una interferencia del Estado con un derecho fundamental supere el escrutinio estricto, que aplicamos en controversias similares a esta en Rivera Schatz v. ELA y C. Abo. PR II, supra, y en Rodríguez Casillas et al. v. Colegio, supra. La medida menos restrictiva a la que hace referencia el escrutinio estricto no es para adelantar el mismo esquema de la medida impugnada, sino para la consecución del interés apremiante del Estado. Alan O. Sykes, The Least Restrictive Means, 70 U. CHL. L. REV. 403, 403 (2003) ("*A proposed alternative may be somewhat more costly to implement, for example, or slightly less effective at achieving the stated regulatory objective, yet still seem quite preferable if it is much less burdensome on the interest that is protected by the least restrictive means requirement.*"). Lo anterior no implica que la medida menos restrictiva propuesta en este caso sea menos efectiva; esto sería especulativo. Igualmente, sería especulativo decir que la Junta Examinadora no es efectiva para regular la profesión médico-

veterinaria, cuando la propia Ley Núm. 194, supra, le provee las facultades para ello. **Las facultades que se le delegaron a la Junta, por la cual sostenemos su efectividad, no son especulativas, son ley.**

En ese sentido, la medida menos restrictiva puede contar con menos herramientas que la impugnada, mas, aun así, adelantar el interés apremiante del Estado y ser efectiva. Eso lo podemos apreciar en casos que han aplicado este escrutinio. A pesar de que un compañero pueda tener reparos con estas aseveraciones,[2] en la esfera federal la aplicación del escrutinio estricto ha tenido el efecto de declarar inconstitucional una medida que contaba con más herramientas.

Así, en U.S. v. Playboy Entertainment Group, Inc., 529 US 803 (2000), el Tribunal Supremo federal declaró inconstitucional la Sec. 505 de la *Telecomunications Act of 1996*, Pub. L. 104-105, 110 Stat. 136, 47 USC sec. 561 (1994 ed., Supp. III). Este estatuto facultaba a los proveedores de televisión por cable a restringir la transmisión de canales de contenido sexual a las horas de 10 p.m. a 6 a.m. El Tribunal Supremo federal concluyó que esta sección era innecesariamente restrictiva porque se basaba en el

---

[2] Opinión concurrente, pág. 12:

> Sin duda, existen diversas maneras para reglamentar una profesión y velar por la excelencia en su ejercicio. Lo que nunca podría consentirse es un desenlace donde el esquema favorecido ponga al Estado en una posición menos efectiva para reglamentar esa profesión. En un caso de esta naturaleza, **la prueba debería conducirnos a validar el mecanismo existente, si en efecto adelanta mejor el interés apremiante que existe**.

contenido de la expresión, en violación de la Primera Enmienda. Emda. I, Const. EE.UU., LPRA, Tomo 1. Sostuvo que el Estado contaba con una medida menos restrictiva: aquella establecida en la Sec. 504, 47 USC sec. 560 (1994 ed. Supp. III). Mediante esta, los suscriptores podían requerirle a los proveedores de televisión por cable que distorsionaran o bloquearan completamente la señal de cualquier canal que el suscriptor no desee recibir. Íd. Sin embargo, se presentó prueba de una encuesta, en la que se encontró que entre marzo de 1996 y mayo de 1997 menos de 0.5% de los suscriptores de televisión por cable requirieron que se bloqueara completamente la señal de algún canal. U.S v. Playboy Entertainment Group, Inc., supra, pág. 816. El Tribunal aceptó que la medida menos restrictiva del derecho a libre expresión (la Sec. 504) no era la más efectiva. Aun así, el Tribunal indicó que si el gobierno quiere optar por una medida más efectiva —sin violar el derecho a la libre expresión— tendría que legislar.[3]

Por tanto, aunque reconocemos que el Colegio lleva a cabo funciones adicionales a las delegadas por ley a la Junta Examinadora, esto no implica que la Junta Examinadora no sea el medio menos oneroso para adelantar el interés apremiante

---

[3] La Corte Suprema federal expresó lo siguiente, al declarar inconstitucional una medida que restringía el derecho a la libertad de expresión, luego de validar la existencia de una medida alterna menos restrictiva: "*The appropriate remedy was not to repair the statute, it was to enjoin the speech restriction. Given the existence of a less restrictive means, if the Legislature wished to improve its statute, perhaps in the process giving careful consideration to other alternatives, it then could do so*". U.S. v. Playboy Entertainment Group, Inc., 529 US 803, 823-824 (2000).

del Estado en la salud del pueblo. Es cierto que el Colegio cuenta con funciones adicionales, como crear y proponer un código de ética, a ser implementado por la Junta Examinadora. Véase, la Sec. 17 de la Ley Núm. 187, 20 LPRA sec. 2968. Empero, eso no implica que la colegiación deba ser compulsoria. Esa función se mantiene sin tener que imponer la colegiación compulsoria. Véase, Rodríguez Casillas et al. v. Colegio, supra, pág. 453.

Con esta determinación no se estaría declarando inconstitucional toda la Ley Núm. 107 que creó el Colegio. Lo único que se declararía inconstitucional es la porción de la ley mediante la cual se estableció la colegiación compulsoria. Por tanto, el Colegio podría seguir llevando a cabo las funciones para las que está facultado y así, complementar a la Junta Examinadora en el adelanto del interés apremiante del Estado en velar por la salud del Pueblo.

Por otro lado, el Colegio y los *amici* hacen una exposición de la normativa federal para señalarnos que dicha esfera ha rechazado aplicar el escrutinio estricto cuando está ante controversias como la que dilucidamos en esta ocasión. La normativa federal en cuestión de libertad de asociación no controla la controversia ante nos. La razón es sencilla, y la expresamos tanto en Rivera Schatz v. ELA y C. Abo. PR II, supra, págs. 809-812, como en Rodríguez Casillas et al. v. Colegio, supra, págs. 448-450. Al atender una controversia de colegiación compulsoria en la que está

inmiscuida el derecho a la libre asociación, analizamos la legislación al amparo del Art. II, Sec. 6 de la Constitución de Puerto Rico, y la jurisprudencia interpretativa correspondiente. Al así hacerlo "resolvemos por fundamentos locales adecuados e independientes al derecho constitucional federal de libertad de asociación". Rodríguez Casillas et al. v. Colegio, supra, pág. 455.

Por último, la Opinión Concurrente da a entender que el escrutinio aplicable a estas controversias debe exigir que quien se oponga a un esquema de colegiación compulsoria debe probar que la medida menos restrictiva existe y que puede funcionar. Opinión Concurrente, pág. 10. Esta aseveración parece invertir el peso de la prueba a la persona que impugna la inconstitucionalidad de una medida que restringe un derecho fundamental, como lo es el derecho a la libre asociación. Cuando aplicamos el escrutinio estricto, el defensor de la colegiación compulsoria debe demostrar que no existe una medida menos restrictiva para alcanzar el interés apremiante que la ley pretende adelantar. Recordemos que, al aplicar este escrutinio, la parte que impugna la constitucionalidad de una ley no viene obligada a probar su inconstitucionalidad, ya que esto último se presume. Rodríguez Casillas et al. v. Colegio, supra, pág. 450; Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813. Esta presunción es la que invierte el peso de la prueba a aquel que sostiene la constitucionalidad de la medida impugnada. ARR, Ex parte, 187 DPR 835, 864-865 (2013). Véase, también,

Rodríguez Casillas et al. v. Colegio, supra, pág. 468. (Opinión de conformidad, J., Rivera García) ("De entrada, el escrutinio estricto tiene el efecto de invertir la carga probatoria".).

Igualmente, la contención relacionada a examinar la viabilidad no puede suponer que hagamos un análisis cuasi-legislativo de la alternativa menos restrictiva. No es que no se tome en consideración la viabilidad cuando se ausculta la existencia de la alternativa menos restrictiva, sino que la viabilidad está comprendida en el examen de la efectividad de la alternativa menos restrictiva. La decisión a la que arribamos hoy toma en consideración la efectividad de la alternativa menos restrictiva, pues determinamos que la Junta Examinadora puede adelantar los intereses apremiantes del Estado al regular la profesión médico-veterinaria, sin que sea necesario menoscabar el derecho de los profesionales a elegir no asociarse.

Ahora bien, el examen sobre la efectividad de la medida menos restrictiva no debe ser una empresa que termine inmiscuyendo al poder judicial en el legislativo. Después de todo, cuando la Asamblea Legislativa creó la Junta Examinadora y le delegó las facultades establecidas en la Ley Núm. 194, supra, debió suponer —o procurar— que sería viable que la Junta realizara las facultades que le delegó. Entendemos que la Junta Examinadora es efectiva para regular la profesión médico-veterinaria, pues así lo entendió la

Asamblea Legislativa cuando la creó y le delegó las facultades que ostenta.

Por los fundamentos anteriores, ante la inconstitucionalidad de la colegiación compulsoria de la profesión médico-veterinaria, voto para confirmar la Sentencia del Tribunal de Apelaciones.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Colegio de Médicos Veterinarios de Puerto Rico<br><br>Apelante<br><br>v.<br><br>Veterinario Express; Dr. Froilán Oliveras Tejeiro; Dra. Patricia N. Pabón Gautier; Dr. Yan F. Vélez Montalvo<br><br>Apelados | AC-2021-0108 | *Apelación* |

**Opinión Concurrente emitida por el Juez Asociado señor Rivera García**

En San Juan, Puerto Rico, a 14 de septiembre de 2022.

Ciertamente, el esquema de colegiación compulsoria aplicable a los médicos veterinarios no se sostiene al palio del derecho fundamental a la no asociación. Al evaluar los **méritos particulares** del caso ante nuestra consideración, **bajo un riguroso escrutinio estricto**, resulta evidente la inconstitucionalidad de la restricción impuesta a los integrantes de la profesión veterinaria. Bajo estos hechos particulares, no cabe duda de que las funciones necesarias para sostener el interés apremiante del estado pueden ser ejercidas y aseguradas mediante una **alternativa viable y menos onerosa**, a saber, la existencia de una junta examinadora.

Según expondré a continuación, la evidencia que surge de los autos apunta a que la Junta Examinadora de Médicos Veterinarios se encuentra habilitada, **como siempre lo ha estado**, para ejercer todas las funciones necesarias para garantizar la excelencia profesional en la práctica de la medicina veterinaria en Puerto Rico. Lo anterior confirma que el esquema regulatorio existente, en esta profesión, no precisa de un requisito de colegiación compulsoria para su consecución efectiva. Por ello, concurro con el resultado anunciado en la *Sentencia* antecedente. Empero, no me es posible unirme al criterio de algunos de mis compañeros, pues **discrepo parcialmente del razonamiento** que subyace su disertación. Me explico.

## I

Por entender que el trasfondo fáctico de este recurso fue recogido adecuadamente en la *Opinión de Conformidad*, procedo directamente a la exposición del derecho aplicable.

Como es sabido, esta Curia ha tenido ocasión en los años recientes para expresarse sobre varias controversias que atañen al derecho a la asociación. En *Rivera Schatz v. ELA II*, 191 DPR 791 (2014), nos expresamos sobre el esquema de colegiación compulsoria que se le había impuesto en nuestra jurisdicción a los abogados. Amparados **exclusivamente en nuestro poder inherente** para reglamentar la profesión legal, declaramos inconstitucionales ciertas

disposiciones de la Ley Núm. 109-2014, las cuales habían reestablecido la colegiación compulsoria de los letrados.[1] Fue nuestro criterio que la reimposición de la colegiación compulsoria a los abogados representaba una intromisión inconstitucional en la esfera delegada a este Tribunal por nuestra Carta Magna.[2] Además, estimamos que, como Foro rector, poseíamos las herramientas necesarias para salvaguardar el buen funcionamiento de la justicia en Puerto Rico.[3]

Es preciso señalar que, al evaluar la improcedencia del esquema de colegiación compulsoria de la profesión legal, indicamos que "los abogados son un grupo de profesionales *sui géneris* que, *contrario a otros grupos profesionales*, están fiscalizados por un ente permanente que los regula de manera independiente a cualquier grupo profesional o colegio".[4] (Énfasis en el original). En aquel momento, expresé mi conformidad con el dictamen, al reiterar que este se había fundado **exclusivamente en el poder inherente** que ostentamos para regular el ejercicio de la abogacía.[5]

Ahora bien, como parte de nuestra exposición del derecho, nos expresamos sobre las imbricaciones constitucionales del requerimiento de asociación a una

---

[1] *Rivera Schatz v. ELA II*, 191 DPR 791, 795 (2014).
[2] Íd., pág. 821.
[3] Íd.
[4] Íd., págs. 816-17.
[5] Íd., pág. 833 (Opinión de conformidad, J. Rivera García).

organización, como precondición para ejercer una profesión.[6] De entrada, reconocimos la preeminencia del derecho a la asociación, el cual incluye el derecho a no asociarse, como parte de nuestro ordenamiento constitucional.[7] La vertiente negativa de este derecho sugiere una intención de que el mismo tenga un ámbito mayor que aquel que se reconoce a nivel federal.[8]

De otra parte, ya en *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011), mediante *Resolución*, habíamos adelantado que "es **la colegiación compulsoria** de una clase profesional la que **crea una fricción inevitable con la libertad de asociación de los afectados**. Por ello, esa limitación significativa de la libertad a no asociarse es constitucional solamente si el Estado demuestra un interés gubernamental apremiante que la hace necesaria".[9] (Énfasis suplido). Así, en *Rivera Schatz v. ELA II*, supra, reconocimos que una medida que incida sobre un derecho fundamental deberá representar no solamente un interés apremiante del Estado, sino que debe ser una **alternativa menos onerosa** para la consecución de ese fin.[10]

Posteriormente, este Foro en *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto*

---

[6] *Rivera Schatz v. ELA II*, *supra*, pág. 809.
[7] Íd. pág. 810. Dispone nuestra Carta Magna que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Const. PR, Art. II, Sec. 6.
[8] Íd., pág. 811.
[9] *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011).
[10] *Rivera Schatz v. ELA II*, *supra*, pág. 813.

*Rico*, 202 DPR 428 (2019) tuvo una segunda ocasión para atender una controversia sobre un esquema de colegiación compulsoria. Allí, resolvimos que nuestra discusión en *Rivera Schatz v. ELA II,* supra*, sobre el derecho a la no asociación, era extensiva a otras profesiones.[11] Acertadamente, afirmamos que concluir lo contrario resultaría en un estado de derecho donde los demás profesionales, frente al Estado, tienen menos derechos que los abogados.[12] Consecuentemente, reiteramos que cualquier actuación estatal que interfiriera con el ejercicio del derecho a la asociación debería sobrepasar, para su validez, **un escrutinio constitucional estricto**.[13] Ello, presupone la existencia de un interés apremiante que haga la actuación necesaria y que el Estado no tenga a su alcance medidas menos onerosas para lograr el interés articulado.[14]

Según concluimos, **en el contexto particular de los técnicos y mecánicos automotrices**, aunque existía un interés apremiante del Estado, la colegiación compulsoria no era el medio menos oneroso.[15] Así, recurrimos a un análisis detallado de las disposiciones que crearon la Junta Examinadora de Técnicos y Mecánicos Automotrices y el Colegio de Técnicos y Mecánicos Automotrices de Puerto

---

[11] *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico*, 202 DPR 428, 451 (2019).
[12] Íd.
[13] Íd., pág. 449-450.
[14] Íd., pág. 450.
[15] Íd., pág. 452.

Rico. Al examinar las funciones particulares de esa junta examinadora, encontramos que se encontraba facultada para,

> ofrecer exámenes, expedir, suspender y revocar las licencias de técnico y mecánico automotriz, adoptar reglamentos para su implementación e investigar a los técnicos y mecánicos por violaciones a esta ley y los reglamentos expedidos por la Junta Examinadora. Así también, en virtud de su facultad para adoptar reglamentos, promulga reglas para asegurar la calidad de la educación continua obligatoria.[16]

A su vez, las funciones pertinentes del Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico eran las de adoptar y velar porque se cumplan los cánones de ética; recibir e investigar querellas, las cuales, de encontrarse causa fundada, se remitirían a la Junta Examinadora de Técnicos y Mecánicos Automotrices; y para proteger a sus miembros en el ejercicio de su oficio y socorrer aquellos que se retiren por inhabilidad física o edad avanzada.[17] Al comparar estas disposiciones, estimamos que sería mediante el buen ejercicio de las facultades delegadas a esa junta examinadora que se lograrían mantener estándares altos en esa profesión.[18]

Precisa resaltar las expresiones que hiciéramos dos (2) miembros de esta Curia en esa ocasión. Según destacó el compañero Juez Asociado señor Estrella Martínez, era "necesario enfatizar que el esquema de colegiación compulsoria invalidado en este *caso particular* no

---

[16] Íd.
[17] Íd., pág. 446.
[18] Íd., pág. 452.

necesariamente corresponde a la realidad de las profesiones restantes en Puerto Rico".[19] (Énfasis en el original). Lo anterior, pues la regulación de las diversas profesiones es un asunto que **no puede tratarse homogéneamente**.[20]

Por mi parte, apuntalé que el hecho de que el gobierno posea un interés apremiante para quebrantar un derecho fundamental es un elemento indispensable, mas no suficiente.[21] Señalé, que ha sido la postura reiterada de este Foro, como la del Tribunal Supremo federal, que resulta trascendental acreditar que la ley o actuación es la menos invasiva al derecho quebrantado.[22] En términos sencillos, es necesario que quien defienda el estatuto que presuntamente violenta el derecho a la asociación demuestre que **ninguna otra alternativa, menos invasiva al derecho, funcionaría**.[23]

## II

La normativa antes expuesta conduce a ciertos lineamientos, que informan la *Opinión Concurrente* que hoy emito. En primer lugar, no hay duda alguna de que **la doctrina de este Tribunal no establece que todos los esquemas de colegiación compulsoria son irremediablemente inconstitucionales**. Más bien, hemos dicho que estos

---

[19] Íd., pág. 457. (Expresión concurrente, J. Estrella Martínez)
[20] Íd.
[21] Íd., pág. 470. (Opinión de conformidad, J. Rivera Garcia).
[22] Íd.
[23] Íd.

mecanismos se encuentran en un estado de fricción permanente con el derecho a la asociación.[24] Acorde con ello, **la colegiación compulsoria de una profesión u oficio solo puede prevalecer cuando el proponente de esta haya logrado sobrepasar, un escrutinio estricto**. Este exige, dos (2) elementos, a saber: (1) un interés apremiante del Estado y (2) que la colegiación compulsoria constituya el medio menos oneroso para adelantar el interés esbozado.[25]

Lo anterior, me conduce al siguiente razonamiento: **la evaluación de la constitucionalidad de un sistema de colegiación compulsoria debe adjudicarse caso a caso**, acorde con las circunstancias **particulares de cada profesión**. Al ponderar los méritos de cada pleito, los tribunales debemos encontrarnos en una posición informada sobre los hechos que motivan cada controversia. Es decir, **la adjudicación de una controversia sobre colegiación compulsoria no se puede dar en abstracto de los hechos particulares de cada profesión**. Por el contrario, requiere un examen cuidadoso de los elementos en juego.

Así las cosas, arribamos a la médula de mi concurrencia con el resultado hoy anunciado. Al examinar la doctrina que hemos diseñado en estos casos, encuentro que no nos hemos expresado sobre un asunto de enorme

---

[24] *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011).
[25] Véanse, *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico*, supra, 449-450 (2019); *Rivera Schatz v. ELA II*, supra.

importancia en estas controversias. Esto es, la necesidad de que el aducido medio menos oneroso —*vis a vis* la colegiación compulsoria— sea **viable como alternativa reguladora**.

Tal y como expresa el Estado en su alegato, le corresponde a este Tribunal,

> "evaluar si la alegación de incapacidad presupuestaria y administrativa de la Junta Examinadora para ejercer las funciones que realiza el Colegio debe ser **un factor que considerar en el análisis** sobre la alegada violación a la libertad de asociación de los miembros del Colegio, ello **a los fines de establecer la viabilidad o efectividad del método menos oneroso** que el legislado para lograr el interés apremiante articulado".[26] (Énfasis suplido).

Desafortunadamente, algunos de mis compañeros desaprovechan esta oportunidad y deciden no expresarse sobre este particular. Lejos de atender la seria preocupación que esboza el Estado, el cual, **no asume postura respecto a la constitucionalidad de la colegiación compulsoria de los médicos veterinarios**,[27] mis compañeros parecen adelantar un razonamiento contrario. Es aquí donde surgen las expresiones que motivan mi concurrencia. Según exponen, "[l]a medida menos onerosa a la que hace referencia el escrutinio estricto no es para adelantar el

---

[26] *Alegato del Estado*, pág. 34. Dicha aseveración despeja cualquier duda sobre la pertinencia de este tema en este y otros casos que surjan respecto al tema de las colegiaciones compulsorias.

[27] En todas las etapas de este litigio el Estado ha optado por solicitarle a los tribunales que resolvamos **"según proceda en derecho"**, en vez de asumir una postura categórica en el litigio constitucional.

mismo esquema de la medida impugnada, sino para la consecución del interés apremiante del Estado".[28] (Énfasis suplido). Continúan al explicar que, "[e]n ese sentido, **la medida menos onerosa puede contar con menos herramientas que la impugnada**, mas, aun así, adelantar el interés apremiante del Estado.[29] (Énfasis suplido).

Respetuosamente, **no puedo suscribir esta postura**. De entrada, si algo debe quedar meridianamente claro es que la consideración de una violación al derecho fundamental a la asociación, el cual incluye el derecho a no asociarse, requiere de un **análisis riguroso y objetivo**. Es decir, nuestro rol en estas controversias no debe ser, **como nunca lo ha sido**, el de adjudicadores autómatas. No podía ser de otra manera, pues en estos temas no estamos ante controversias *proforma*, donde la mera mención de ciertas palabras sacramentales —como Junta Examinadora— nos obligan a resolver en determinada manera.

En estos casos, las partes deben exponer **de forma fundamentada** las razones por las cuales el mecanismo de colegiación compulsoria es o no es el medio menos oneroso para lograr ese fin. Es con este segundo aspecto que debemos ser especialmente cuidadosos. Como intimé, no se trata de un elemento que se pueda establecer con meras expresiones abstractas. Más aun, estoy convencido de que el

---

[28] *Opinión de Conformidad*, pág. 23.
[29] Íd. pág. 24.

escrutinio aplicable a estas controversias debe exigir que quien se oponga a un esquema de colegiación compulsoria deba probar que **el medio menos oneroso existe y que este puede funcionar**.[30] En otras palabras, que **la alternativa a la colegiación compulsoria es viable**.

Distinto a como pudiera caracterizarse, valorar la viabilidad de una alternativa a la colegiación compulsoria, lo que incluye temas de naturaleza presupuestaria, no implica un acto ajeno a la función de los tribunales. Ciertamente, he sido consistente en mi defensa férrea de la separación de poderes y del rol apropiado de este Tribunal dentro de nuestro esquema constitucional.[31] Jamás avanzaría una postura que promueva una intromisión de este Foro en las facultades delegadas a otro de los hermanos poderes constitucionales. Sin duda, si hay algo que se desprende patentemente del derecho aplicable a estos casos, es que la reglamentación adecuada de las distintas profesiones, salvo la legal, compete decididamente al Poder Legislativo.

Ahora bien, cuando se suscita una controversia jurídica, particularmente de índole constitucional, venimos

---

[30] Si bien la *Opinión de Conformidad* sugiere que lo que aquí propongo tiene el efecto de invertir la carga probatoria en estos pleitos, esto no es del todo correcto. Véase *Opinión de Conformidad*, págs. 27-28. Meramente, cuando la parte que apoye el esquema existente sustente sus alegaciones de que la alternativa no es viable y efectiva, la parte contraria, entiéndase, **quien se oponga a la colegiación compulsoria, tendría que refutar tales planteamientos**.

[31] *Santini Casiano v. ELA*, 199 DPR 389, 423 (2017) (Opinión disidente, J. Rivera García); *Alvarado Pacheco v. ELA*, 188 DPR 594 (2013) (Opinión de conformidad, J. Rivera García); *Bomberos Unidos v. Cuerpo Bomberos*, 180 DPR 723, 749 (2011).

obligados a ejercer nuestro propio poder delegado. Demás está decir que los tribunales debemos ser celosos guardianes de nuestras facultades constitucionales. Así, a la hora de considerar toda controversia, debemos examinar los méritos de lo expuesto, a la luz de la prueba presentada, y adjudicar según proceda en derecho. Naturalmente, las controversias sobre la colegiación compulsoria no pueden ser distintas.

No podemos exigir otra cosa que no sea que las partes en estos litigios establezcan propiamente los elementos exigidos por nuestro ordenamiento. A la hora de establecer la existencia de un medio menos oneroso, si nuestro escrutinio ha de tener alguna utilidad práctica, **la prueba debe indicar que esa opción en efecto puede sustituir efectivamente el esquema que se pretende declarar inconstitucional**. Es por ello, que tendría serios reparos con la invalidación de un esquema de colegiación compulsoria cuando el alegado medio menos oneroso le ofrece al Estado menos herramientas en su rol protector del interés público.

Sin duda, existen diversas maneras para reglamentar una profesión y velar por la excelencia en su ejercicio. Lo que nunca podría consentirse es un desenlace donde el esquema favorecido ponga al Estado en una posición menos efectiva para reglamentar esa profesión. En un caso de esta naturaleza, **la prueba debería conducirnos a validar el**

**mecanismo existente, si en efecto adelanta mejor el interés apremiante que existe**. Por tanto, debemos examinar las particularidades de cada profesión y el esquema que se ha escogido para reglamentarla.

**III**

Expuesto lo anterior, procedo a examinar los hechos ante nuestra consideración.

En el caso de los Médicos Veterinarios, los hechos demuestran objetivamente y sin ambages que la colegiación compulsoria no es necesaria para propulsar la excelencia profesional. Es decir, la reglamentación de la profesión de la medicina veterinaria puede operar efectivamente sin la necesidad de un requisito de colegiación compulsoria. Es decir, que **la alternativa a la colegiación compulsoria existe y es viable**. Veamos.

Como punto de partida, debemos repasar brevemente las disposiciones legales que regulan los deberes y facultades de tanto la Junta Examinadora de Médicos Veterinarios (Junta Examinadora) como del Colegio de Médicos Veterinarios de Puerto Rico (CMVPR).[32] Según dispone el Artículo 4 de la Ley del Ejercicio de la Medicina Veterinaria de Puerto Rico "[s]ólo podrán ejercer la medicina veterinaria en Puerto Rico los médicos-

---

[32] Véanse Ley del Ejercicio de la Medicina Veterinaria en Puerto Rico, Ley Núm. 194 del 4 de agosto de 1979, según enmendada, 20 LPRA sec. 2951 *et seq.*, Ley del Colegio de Médicos Veterinarios de Puerto Rico, Ley Núm. 107 del 10 de julio de 1986, 20 LPRA sec. 2971 *et seq.*

veterinarios **debidamente licenciados por la Junta**".[33] (Énfasis suplido).

Entre otras facultades, la Junta Examinadora se encuentra habilitada para (1) emitir, renovar, denegar, suspender y revocar licencias permanentes y provisionales en el ejercicio de la medicina veterinaria; (2) tomar medidas disciplinarias; (3) aprobar reglas, reglamentos, ordenes o resoluciones necesarias para hacer cumplir la ley y (4) puede investigar y celebrar audiencias con relación al ejercicio ilegal de la medicina veterinaria.[34] Además, la Junta Examinadora es el ente responsable de establecer, mediante reglamento, los requisitos y procedimientos para la recertificación de los médicos veterinarios.[35]

En lo pertinente al CMVPR, su ley habilitadora le impone ciertos deberes.[36] No obstante, al examinar los mismos, surge con meridiana claridad que se tratan de **expresiones aspiracionales**. Es decir, mediante estos deberes no se le asigna al gremio ningún tipo de función reguladora particular. Por otra parte, la Sección 8 del mismo estatuto consigna expresamente las facultades que ostenta el CMVPR.[37] Sin duda, sería aquí donde habríamos de encontrar las presuntas facultades que el CMVPR aduce que ejerce y que, de otro modo, el Estado tendría que asumir de

---

[33] 20 LPRA sec. 2954.
[34] 20 LPRA sec. 2956.
[35] Íd.
[36] 20 LPRA sec. 2971c.
[37] 20 LPRA sec. 2971d.

eliminarse la colegiación compulsoria. No obstante, un simple examen de estas demuestra que la sección precitada meramente inviste al CMVPR con las facultades que nuestro ordenamiento rutinariamente les asigna a las personas jurídicas. Así, el CMVPR puede: (1) subsistir a perpetuidad bajo su propio nombre, (2) demandar y ser demandado, (3) poseer y usar un sello, (4) adquirir sellos y bienes, (5) nombrar directores, oficiales y funcionares, (6) adoptar su reglamento, entre otros.[38]

Además, el CMVPR puede recibir e investigar quejas respecto a la conducta de sus miembros y las violaciones a su ley habilitadora.[39] No obstante, lo anterior es sin perjuicio de la facultad ostentada por la Junta Examinadora para iniciar investigaciones por aquellas violaciones que se puedan dar a la Ley del Ejercicio de la Medicina Veterinaria de Puerto Rico.[40] También, el CMVPR puede adoptar los cánones de ética profesional que deben regir la conducta de los médicos veterinarios.[41] Lo anterior, en evidente sintonía con el Artículo 21 de la Ley del Ejercicio de la Medicina Veterinaria en Puerto Rico.[42] Finalmente, la ley faculta al CMVPR para **ofrecer cursos de educación continua para sus miembros**.[43]

---

[38] Íd.
[39] Íd.
[40] Íd.
[41] Íd.
[42] 20 LPRA sec. 2968.
[43] 20 LPRA sec. 2971d.

Ahora bien, a lo largo de este proceso, el CMVPR ha centrado su oposición a la eliminación del requisito de colegiación compulsoria en base a tres (3) aspectos: (1) el ofrecimiento de cursos de educación continuada, (2) el ámbito ético disciplinario y (3) las funciones que ejecuta el gremio en pro de la comunidad. En concreto, la mayoría de sus alegaciones reproducen las expresiones que el gremio hiciera ante la Comisión de Gobierno de la Cámara de Representantes en ocasión de considerarse el P. de la C. 1803.[44] En lo pertinente, ese proyecto de ley precisamente contempló la eliminación del requisito de colegiación compulsoria de los médicos veterinarios.[45]

En su *Memorial Explicativo*, el CMVPR sostuvo que,

> **delegar a la Junta Examinadora todas las facultades y responsabilidades que hoy día recaen en el Colegio**, lejos de cumplir el compromiso que se indica en el Proyecto de Ley 1803, en la práctica encarecerá para el medico veterinario el ejercicio de su profesión y ciertamente aumentará de forma exponencial los costos en que tendría que incurrir el propio Estado. (Énfasis suplido).[46]

Es mediante estas expresiones que surge, sin duda, la contención principal que aún sostiene el CMVPR, a saber, que la eliminación del requisito de colegiación compulsoria supone la presunta transferencia de ciertas funciones desde el CMVPR hacia la Junta Examinadora. El CMVPR, además,

---

[44] P. de la C. 1803 de 24 de septiembre de 2018, 4ta Sesión Ordinaria, 18va Asamblea Legislativa.
[45] Íd., pág. 5.
[46] Apéndice del *Certiorari*, Memorial Explicativo P. de la C. 1803, pág. 323.

sugiere que la Junta Examinadora no se encuentra capacitada, principalmente en términos presupuestarios, para asumir dichas funciones. No obstante, a poco examinar el referido *Memorial Explicativo*, resulta evidente que no hay función alguna que el CMVPR ostente y que la Junta Examinadora ya no ejerza. Veamos.

Como indiqué, el CMVPR aduce que la eliminación del requisito de colegiación compulsoria supondría un atentado contra el ofrecimiento de cursos de educación continuada para los médicos veterinarios.[47] No obstante, en sus propias palabras, el apelante expresa que,

> **[l]a Junta Examinadora de Médicos Veterinarios de Puerto Rico [] es quien evalúa la calidad de los cursos y aprueba su acreditación.** Al haber muy pocos proveedores de cursos que cumplan con los estándares impuestos por la Junta Examinadora, su disponibilidad seria severamente limitada, si no anulada, de no estar el Colegio involucrado en estos servicios.[48] (Énfasis suplido).

El defecto en este razonamiento es que sencillamente no guarda relación con la realidad. La eliminación del requisito de la colegiación compulsoria no supone efecto alguno para la facultad ──**estatutaria**── que el CMVPR ostenta para ofrecer servicios de educación continuada. El propio gremio admite que quien regula este proceso es la Junta Examinadora. **Es decir, en estos momentos, el CMVPR no tiene función alguna que no sea ser un proveedor más de educación continuada**. Difícilmente puede catalogarse esta

---

[47] Íd., págs. 322-23.
[48] Íd. pág. 323.

situación de hechos como una transferencia de funciones entre dos (2) entidades.

A su vez, respecto a las funciones disciplinarias, el CMVPR aduce que este y la Junta Examinadora ejercen facultades distintas, pero complementarias.[49] Así, expresan que "[l]a disciplina se establece y verifica por los pares de iguales que componen la profesión, quienes tienen la experiencia y pericia necesaria para lograr un dictamen justo y certero".[50] Nuevamente, tales expresiones no se ajustan al esquema existente. Según examinamos, las leyes que regulan tanto el CMVPR y la Junta Examinadora establecen sin ambages que es esta última quien posee las facultades disciplinarias sobre los miembros de la profesión. Además, la Junta Examinadora viene obligada a adoptar los cánones de ética que promulgue el CMVPR, sin que esto de forma alguna se encuentre condicionado a la existencia del requisito de colegiación compulsoria. Así pues, el supuesto poder de autodisciplina que el CMVPR sostiene que posee no es otra cosa que la facultad de un ente colegiado para disciplinar a sus propios miembros, de conformidad con sus reglamentos. Nada más.

Finalmente, el CMVPR detalló una lista extensa de actividades comunitarias y benéficas que acostumbra a ofrecer.[51] En cuanto a esto, nuevamente, el apelante no

---

[49] Íd., pág. 324.
[50] Íd.
[51] Íd., págs. 325-26.

explica como alguna de estas funciones tendría que ser ejercida por la Junta Examinadora a partir del momento en que cese la colegiación compulsoria. El CMVPR meramente nos recuerda la lista de actividades loables que ejercita. Ciertamente la eliminación de la colegiación compulsoria no atenta en forma alguna contra el derecho del CMVPR a ejecutar actividades lícitas en beneficio de la sociedad.

En fin, el CMVPR nos admite que su rol es **"complementar"** y **"servir de brazo"** al Estado.[52] (Énfasis suplido). Es decir, la propia entidad que defiende la colegiación compulsoria deja entrever que **su rol no es el de ejercer funciones de otro modo pertenecientes al Estado**, sino el de **complementar las ya ejercidas por la Junta Examinadora**. Al examinar el esquema impugnado ⸺ y considerar particularmente la viabilidad de la alternativa propuesta⸺ resulta evidente que la reglamentación de la medicina veterinaria no precisa de la colegiación compulsoria para su consecución efectiva.

No obstante, en vez de atender este asunto y concluir que no hay dudas sobre la viabilidad de un sistema de reglamentación profesional en ausencia de una colegiación compulsoria, ciertos miembros de este Foro prefirieron un curso alterno. Así, optaron por estimar que la Junta Examinadora era capaz de mantener los altos estándares

---

[52] *Alegato de la Parte Apelante*, pág. 15.

profesionales que han de esperarse en este campo, **sin resolver que la evidente viabilidad de esa alternativa era un elemento pertinente en el análisis en este tipo de casos**. Por tales fundamentos, **concurro**.


Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Colegio de Médicos Veterinarios
de Puerto Rico

    Apelante

       v.                          AC-2021-0108

Veterinario Express; Dr. Froilán
Oliveras Tajeiro; Dra. Patricia
N. Pabón Gautier; Dr. Yan F.
Vélez Montalvo

    Apelados

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión Disidente a la que se une el Juez Asociado señor Estrella Martínez

En San Juan, Puerto Rico, a 14 de septiembre de 2022.

Hoy se pone en precario la función neurálgica y apremiante del Colegio de Médicos Veterinarios de Puerto Rico (Colegio). No hay duda de que la Legislatura le otorgó funciones distintas y más amplias al Colegio para procurar y fortalecer la salud pública en Puerto Rico. Más allá de retórica, no hay evidencia de que esos intereses apremiantes se podrán cumplir a través de la Junta Examinadora de Médicos Veterinarios (Junta Examinadora). No se puede cumplir entonces con ser el mecanismo menos oneroso cuando no se cumple con el interés apremiante que mandata la ley. Esta no tiene la facultad delegada por ley por la Asamblea Legislativa, el andamiaje, el personal ni los recursos para hacerlo. En cambio, el Colegio sí, y el mecanismo

para instrumentarlo es, precisamente, la obligatoriedad de la colegiación que dispone la Sección 5 de la Ley Núm. 107 del 10 de julio de 1986, 20 LPRA Sec. 2971, et seq. (Ley Núm. 107-1986). Que no quepa duda de que hoy se le dio una tajada a la salud pública de todos y todas.

Según establecido por esta Curia, el derecho a la no asociación —que se deriva del derecho a asociarse consagrado en la Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 6, infra— cede ante intereses estatales de naturaleza claramente imperiosos. Colegio de Abogados de P.R. v. Schneider, 112 DPR 540, 549 (1982). Como veremos, con el asunto de la colegiación compulsoria el Estado persigue un interés apremiante más abarcador que la regulación de la profesión. Ello requería un análisis particularizado y "caso a caso" de esta controversia. Dado que una mayoría de este Tribunal empleó un análisis constitucional incompleto y errado que omite considerar el rol del Colegio en la salud pública, más allá de sus competencias disciplinarias, disiento.

## I

### A. Junta Examinadora de Médicos Veterinarios y el Colegio de Médicos Veterinarios de Puerto Rico

La Asamblea Legislativa, por virtud de la Constitución, puede regular y controlar la práctica de las profesiones en aras de proteger la salud y el bienestar público y evitar el fraude y la incompetencia.[1] Véase, Rodríguez Casillas v.

---

[1] Sobre este particular este Tribunal expresó que:

<u>Colegio de Tec. Mec.</u>, 202 DPR 428, 440 (2019). Conforme a esta facultad, la Asamblea Legislativa promulgó la Ley Núm. 194 de 4 de agosto de 1979, según enmendada, conocida como la *Ley del ejercicio de la medicina veterinaria de Puerto Rico*, 20 LPRA sec. 2951 *et seq* (Ley Núm. 194-1979) mediante la cual creó la Junta Examinadora de Médicos Veterinarios. Entre los deberes y facultades de la Junta Examinadora está regular todo lo relacionado a la admisión de los y las aspirantes a ejercer la profesión

---

La potestad del Estado para regular y controlar el ejercicio de las profesiones es reconocida universalmente. Hoy no se discute. Se cimienta en principios elementales de salud y bienestar general. Entre sus elementos esenciales la reglamentación cubre el aspecto de los requisitos para la admisión al ejercicio de la profesión. En nuestra democracia, como afirmamos en <u>Infante v. Junta de Médicos Exam. de P.R.</u>, 43 DPR 325, 330 (1932), "[t]oda persona tiene derecho a ejercer la medicina, la abogacía o cualquier profesión o negocio que crea conveniente pero no como un derecho absoluto sino como mera licencia subordinada a los requisitos y condiciones que razonablemente imponga la legislatura en el ejercicio del poder regulador (police power) que tiene para beneficio de la comunidad". <u>Pérez v. Junta Dental</u>, 116 DPR 218, 233 (1985) (citas depuradas).

Cónsono con lo anterior, en <u>Marcano v. Dpto. de Estado</u>, 163 DPR 778, 786-787 (2005), este Tribunal determinó que:

El Estado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otro que esté racionalmente relacionado con el objetivo de garantizar que los examinados posean la competencia para practicar la profesión en forma adecuada.

El Estado también puede prohibir la práctica de la profesión si no se ha obtenido antes una licencia, permiso o certificado de alguna entidad u oficial examinador. De este modo, se ha delegado en las Juntas Examinadoras la tarea de corroborar que un ciudadano posea los conocimientos y las destrezas necesarias para ejercer determinada profesión. A estos organismos se les ha reconocido una extensa discreción 'en la fijación de las normas y procedimientos que han de regir los procesos de admisión o certificación de personas al ejercicio' de profesiones u oficios… Empero al ejercer su función no puede violar los derechos constitucionales de los aspirantes amparándose en su amplia facultad revisora. (citas depuradas).

médico-veterinaria mediante la administración de un examen

de reválida y la correspondiente expedición de una licencia.[2]

---

[2] La Junta Examinadora tendrá los deberes y facultades siguientes:

(a) Examinar y evaluar las calificaciones morales y académicas de cada solicitante a examen de reválida conducente a la licencia para ejercer la medicina veterinaria en Puerto Rico, inclusive mediante entrevista personal con el solicitante.

(b) Emitir, renovar, denegar, suspender y revocar licencias permanentes y provisionales para el ejercicio de la medicina veterinaria en Puerto Rico, así como tomar medidas disciplinarias, en relación con los tenedores de dichas licencias, que sean consistentes con este capítulo y con los reglamentos promulgados al amparo del mismo. Disponiéndose, además, que, en conjunto con la Subjunta, emitirá las licencias para tecnólogos veterinarios y técnicos veterinarios.

(c) Celebrar audiencias en relación con cualquier asunto apropiado que tenga ante sí, tomar juramentos, recibir evidencia, hacer las determinaciones que procedan, y dictar órdenes consistentes con tales determinaciones. La Junta podrá citar testigos, requerir la presentación de evidencia documental, y autorizar la toma de deposiciones. Si una citación expedida por la Junta fuese desobedecida, la Junta podrá comparecer ante el Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico y solicitar que se ordene el cumplimiento de la citación. El Tribunal de Primera Instancia podrá dictar órdenes haciendo obligatoria la comparecencia de testigos o la presentación de documentos previamente requeridos por la Junta, según sea el caso, y tendrá facultad para castigar por desacato la desobediencia a dichas órdenes.

(d) Aprobar, enmendar o revocar aquellas reglas, reglamentos, órdenes, resoluciones o determinaciones necesarias al cumplimiento de este capítulo.

(e) Redactar y aprobar un reglamento para su funcionamiento interno.

(f) Adoptar, poseer y usar un sello oficial que podrá alterar a su voluntad y que hará estampar en todas las licencias y certificaciones que expida, como señal de autenticidad de tales instancias.

(g) Demandar y ser demandado como persona jurídica.

(h) Otorgar y ejecutar todos los documentos necesarios o adecuados al ejercicio de sus facultades y poderes.

(i) Investigar y celebrar audiencias con relación al ejercicio ilegal de la Medicina Veterinaria por personas sin licencia. Disponiéndose, que a tales efectos regirán las disposiciones de las secs. 9601 et seq. del Título 3, conocidas como la 'Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico'. La Oficina de Reglamentación y Certificación de Profesionales de la Salud proveerá los recursos necesarios para llevar a cabo las investigaciones y audiencias al respecto.

(j) Establecer por reglamento los requisitos y procedimientos para recertificación de los médicos veterinarios cada tres (3) años según requerido en las secs. 3001 et seq. del Título 24.

(k) Redactar y promulgar reglamentación a los efectos de establecer los mecanismos mediante los cuales se permita que una persona que no sea veterinario licenciado podrá efectuar consultas o procedimientos en animales bajo la supervisión de un veterinario licenciado.

(l) La Junta cumplirá con lo establecido en las secs. 9601 et seq. del Título 3, conocidas como la 'Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico', al ejercer las facultades y adjudicar asuntos de su jurisdicción, inherencia e incumbencia.

(m) Remitir al Gobernador, por conducto del Secretario de Salud, un informe anual de sus labores en el cual se evidencie el número de solicitantes de examen de reválida, el número de licencias expedidas, suspendidas o revocadas, con las razones para tales suspensiones y revocaciones, y sobre recertificación de los médicos veterinarios licenciados, entre otros renglones.

(n) Disponer y fijar por reglamento el monto de cuotas, tarifas, derechos y otros renglones a recibirse en recaudación por concepto de: solicitud para examen de reválida, manual informativo, examen de reválida, reexamen, certificación y recertificación de licencia, y para otras funciones oficiales de la Junta; Disponiéndose, además, que la Junta podrá, por reglamento, alterar o modificar dichas cuantías arancelarias, ajustándolas prudentemente según lo hiciere necesario la actualidad.

(o) Redactar y promulgar reglamentación sobre las funciones y responsabilidades de todo el personal de apoyo al médico veterinario incluyendo, sin que sea una limitación a los tecnólogos veterinarios, técnicos veterinarios. Disponiéndose, que tales funciones y labores no incluirán diagnóstico, pronóstico, prescripción ni cirugía. 20 LPRA sec. 2956.

Véanse, Arts. 9, 14 y 14.1 de la Ley Núm. 194-1979, 20 LPRA secs. 2959, 2963 & 2963(a).

De otra parte, la Asamblea Legislativa creó el Colegio en virtud de la Ley Núm. 107-1986. Su creación se sustentó en que:

> Los avances de la tecnología, de la anatomía y la fisiología animal, los de anatomía patológica y los de la bacteriología han convertido a la medicina veterinaria en una verdadera ciencia. Desde los memorables experimentos de Pasteur, efectuados en 1881, acerca de la vacunación anticarbuncosa, y los trabajos de Trobaldo Smith de 1889 demostraron que la fiebre de las garrapatas se transmite al ganado vacuno por intermedio de estos ácaros, este hecho fue indudablemente uno de los hechos que determinaron el avance de la parasitología y el estudio médico veterinario que atiende innumerables virus y enfermedades que obedecen a causas muy diversas.

> **Un aspecto muy importante de estos estudios desde el punto de vista de salud pública es la inspección veterinaria a que deben someterse todas las carnes y productos animales que se envían al mercado, a fin de que no puedan constituir jamás un foco de infecciones y un peligro a la salud de nuestro [P]ueblo.** Véase, Exposición de Motivos, Ley Núm. 107-1986 (énfasis suplido).

De esta manera, la Asamblea Legislativa, **"consciente de su responsabilidad para salvaguardar la salud de nuestro [P]ueblo, su nivel intelectual y cultural, y el mejoramiento científico de nuestras industrias"**, impuso el requisito de colegiación compulsoria para la práctica de la profesión médico-veterinaria. Íd. (énfasis suplido).

Así, la Asamblea Legislativa facultó al Colegio para: (1) adoptar su reglamento, que será obligatorio para todos y todas sus miembros y para enmendar aquel, en la forma y

bajo los requisitos que en este se estatuyan; (2) adoptar o implantar los cánones de ética profesional que regirán la conducta de los y las médicos veterinarios; (3) recibir e investigar las quejas juradas que se formulen respecto a la conducta de los y las miembros en el ejercicio de la profesión y violaciones a la ley, y (4) establecer cursos de educación continua para los y las miembros del Colegio. Adicionalmente, en aras de salvaguardar la salud pública del país y el nivel intelectual y cultural de los y las médicos veterinarios, la legislatura le encomendó al Colegio a cumplir con varios deberes, entre ellos:

(a) contribuir al adelanto y desarrollo de la ciencia y el arte de la medicina veterinaria estimulando el continuo desarrollo profesional de[l y la] médico veterinario mediante la divulgación de conocimientos científicos;

(b) laborar por la implantación de leyes adecuadas que respondan a un espíritu razonable y justo y que tengan relación con la profesión del [y la] médico veterinario y defender la misma de cualquier ley perjudicial;

(c) sostener y estimular un mayor sentido de comprensión entre el [y la] médico veterinario y los [y las] demás profesionales;

(d) contribuir al adelanto de la medicina veterinaria mediante la investigación científica;

(e) suministrar los informes pertinentes que el Gobierno solicite, y

(f) cooperar con el mejoramiento de la práctica de la medicina veterinaria, velando en todo momento por la salud pública.
Véase, 20 LPRA sec. 2971c.

En atención a lo anterior, la Asamblea Legislativa estableció por virtud de ley la colegiación compulsoria de la clase médico-veterinaria con miras a salvaguardar la salud pública y desarrollar la práctica de la medicina veterinaria fuera de los parámetros tradicionales. Es de notar que en esa gestión la Asamblea Legislativa le confirió al Colegio facultades más amplias que las que delegó a la Junta Examinadora con el objetivo de mejorar la profesión, y con ello, la salud del Pueblo.

**B.    Derecho a la libre asociación**

Nuestra Constitución establece que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. ELA, LPRA, Tomo 1. Adviértase que esta protección constitucional se articuló en términos positivos, entiéndase, escoger pertenecer a una asociación. Sin embargo, se ha reconocido una vertiente negativa de este derecho, por lo que también se reconoce el derecho constitucional de las personas a no asociarse. Rodríguez Casillas v. Colegio de Tec. Mec., supra, pág. 449; Rivera Schatz v. Colegio de Abogados, 191 DPR 791, 811-812 (2014).[3] Ahora bien, ninguna de estas vertientes, la positiva

---

[3] A manera de ilustración, en Estados Unidos el derecho a la libre asociación no se encuentra expresamente reconocido en su Constitución. Más bien, se le considera un corolario del derecho a la libertad de expresión, tutelado por la Primera Enmienda y aplicable a los estados a través de la Decimocuarta Enmienda. Véase, NAACP v. Alabama, 357 US 449, 460-61 (1958). La incorporación jurisprudencial del derecho a la libre asociación en el Derecho Constitucional federal reconoce igualmente una vertiente positiva y negativa. Véanse, NAACP v. Alabama, supra; Abood v. Detroit Bd. of Edu., 431 US 209 (1977).

y la negativa, configura un derecho absoluto a la libre asociación. Rodríguez Casillas v. Colegio de Tec. Mec., supra, pág. 476; P.N.P. v. De Castro Font II, 172 DPR 883 (2007); P.A.C. v. E.L.A. I, 150 DPR 359 (2000); Democratic Party v. Tribunal Electoral, 107 DPR 1 (1978). Ello significa que el Estado puede actuar o regular este derecho en determinadas circunstancias.

Es menester notar que "[a]l no ser un derecho absoluto, la libertad de asociación, al igual que el derecho a no asociarse, **puede ceder en determinadas circunstancias ante intereses de mayor jerarquía o ante situaciones que revistan un alto interés público**". Rivera Schatz v. Colegio de Abogados, supra, pág. 869 (Opinión Disidente de la Jueza Presidenta Fiol Matta) (énfasis suplido). He ahí la razón por la cual no se debe analizar de la misma manera la colegiación compulsoria de todas las profesiones. Es preciso auscultar el interés que persigue el Estado con cada una ya que existen intereses de la más alta preeminencia que pueden justificar un tratamiento jurídico distinto.

La libre asociación es un derecho fundamental. Por tal razón, se estableció que cualquier acción del Estado sobre ese derecho está sujeta a un escrutinio estricto. Rivera Schatz v. Colegio de Abogados, supra, pág. 813; Rodríguez Casillas v. Colegio de Tec. Mec., supra, págs. 449-450. Este método de revisión judicial supone superar dos criterios para sostener la validez de una actuación estatal que contraviene el derecho a la libre asociación. En primer

lugar, el Estado debe demostrar que la acción cuestionada sirve un interés gubernamental apremiante. Íd. Segundo, debe probar que no tenía a su alcance medidas menos onerosas para lograr el interés articulado. Íd.

Así, a fin de examinar controversias donde se plantee la posible vulneración al derecho a la libre asociación en su vertiente negativa, es necesario satisfacer el escrutinio estricto.

## II

Hoy este Tribunal declara inconstitucional la colegiación obligatoria de otro gremio sin realizar un análisis adecuado de los intereses involucrados.

Reitero que la colegiación compulsoria de las distintas profesiones se debe evaluar caso a caso y no puede tratarse de manera homogénea. Por eso, en lugar de aplicar de manera mecánica la norma que adoptó una Mayoría en Rivera Schatz v. Colegio de Abogados, supra, en este caso era imperativo evaluar el rol puntual del Colegio. Ello hubiera permitido confirmar que las funciones que cumple en pro de la salud pública trascienden las competencias disciplinarias y reguladoras de la profesión.

El Colegio expone que, para adelantar la salud de las personas, posee unos deberes y obligaciones delegados por ley que la Junta Examinadora no tiene.[4] Entre los intereses de salud pública que el Colegio promueve están: (a) evitar

---

[4] Véase, *Apelación*, págs. 23-24.

infecciones y peligros a la salud de nuestro Pueblo en los alimentos que consumen que son producto de animales; (b) evitar el intrusismo, y (c) salvaguardar la salud de nuestro Pueblo, a nivel intelectual y cultural, y el mejoramiento científico de las industrias.[5] Explica que su labor es indispensable para la salud pública porque alrededor de 60% de las enfermedades infecciosas en humanos son típicamente transmisibles por los animales.[6]

Ante la envergadura del trabajo del Colegio, este argumenta que el razonamiento del Tribunal de Apelaciones —en cuanto que nada impide que el Colegio continúe cumpliendo sus deberes y obligaciones mediante una matrícula voluntaria— es desacertado.[7] La Ley Núm. 107-1986 no le asignó una partida de dinero para costear los trabajos. Por ende, los deberes y funciones que el Colegio brinda a la ciudadanía dependen, en parte, del pago de la cuota anual de los y las miembros del Colegio, a razón de $175.[8] Por tal razón, arguye que la colegiación compulsoria de la clase médico-veterinaria es la medida menos onerosa para adelantar intereses indispensables en el campo de la salud pública.

Según vimos, cuando se plantea una posible vulneración al derecho a la libre asociación en su vertiente negativa, es necesario satisfacer el escrutinio estricto. Como primer

---

[5] Íd., pág. 15.
[6] Íd., pág. 21.
[7] Íd., pág. 22.
[8] Íd., págs. 22, 24.

paso, debemos validar si la acción cuestionada sirve un interés apremiante del Estado.

Según surge de la Exposición de Motivos de la Ley Núm. 107-1986, el Colegio se creó para adelantar **el interés de salud pública.** En específico, la Ley Núm. 107-1986 pretende adelantar los intereses siguientes: (1) evitar infecciones en los alimentos que provienen de los animales; (2) evitar el intruismo; (3) salvaguardar la salud de la medicina veterinaria a través de investigación y desarrollo científico; (4) adoptar o implantar los cánones de ética profesional que regirán la conducta de los médicos veterinarios; (5) implementar programas de servicio a la comunidad; (6) contribuir al adelanto y desarrollo de la ciencia, entre otros. Nótese que el interés que persigue la ley no es sobre los estándares de la profesión sino sobre la salud pública.

Cónsono con ello, y en cumplimiento con los deberes, el Colegio:

(1) ha revisado y opinado sobre otros reglamentos, proyectos de ley (como el de la Ley de Sustancias Controladas, la Ley para la Creación del Registro de Convictos por Maltrato de Animales en Puerto Rico; la Ley de Refugios de Animales Durante Emergencias o Desastres Naturales, y la Ley Especial contra el Abandono y Desamparo de los Animales de Puerto Rico);

(2) ha redactado y propuesto anteproyectos de beneficio para los animales de Puerto Rico, como los del registro de animales y vacunación contra la rabia y la reglamentación del despacho de medicamentos veterinarios de receta, una estrategia orientada a proteger la cadena alimentaria de residuos de productos farmacéuticos en los animales de consumo;

(3)    ha favorecido proyectos que aumentaron las penas por maltrato de animales;

(4)    ha cabildeado para la creación de un registro de mascotas para ser identificadas mediante *microchip*;

(5)    ha realizado una investigación sobre las condiciones del Zoológico de Mayagüez, mediante la cual se realizaron tres vistas oculares donde participaron miembros de la Asamblea Legislativa y donde se creó un Comité Clínico para evaluar las facilidades y la condición de salud de los animales. Ello resultó en la elaboración de informe detallado que se presentó a la Asamblea Legislativa;

(6)    ha invertido e invierte en iniciativas dirigidas a educar a la ciudadanía en medios de comunicación. Asimismo, creó el Programa de Educación Humanitaria con la misión de promover el establecimiento del programa en las escuelas de Puerto Rico, el cual fomenta la empatía y respeto para todas las formas de vida y ambiente;[9]

(7)    ha contribuido y contribuye a la educación sobre todos los temas relacionados con animales (como enfermedades transmisibles de animales a humanos, la tenencia responsable de mascotas, el abuso y el maltrato de los animales, y la problemática de los animales realengo);[10]

(8)    ha invertido e invierte dinero y trabajo para crear y desarrollar un registro digital para mascotas;

(9)    ofrece servicios comunitarios (como becas, adiestramientos, talleres, charlas sobre maltrato animal y campañas educativas y alianzas con agencias de la Rama Ejecutiva);

(10)   ha facilitado a sus miembros la participación en estudios con entidades federales, como el *Center for Disease Control and Prevention* y el Departamento de Agricultura federal;

(11)   creó, junto con otras entidades, la iniciativa del *Spayathon for Puerto Rico* con el fin de esterilizar libre de costo a más de veinte mil mascotas, y

---

[9] El Colegio invierte anualmente alrededor de $35,000 en iniciativas educativas para la comunidad en general. Véase, *Apelación*, pág. 20.
[10] El Colegio invierte anualmente alrededor de $178,000 en actividades educativas para la clase médico-veterinaria. Íd., pág. 18.

(12) monitorea y fiscaliza la práctica ilegal de la medicina veterinaria en el país.
Véase, *Alegato del Estado*, págs. 11-12.

De la Ley Núm. 107-1986 surge claramente que el interés de la Asamblea Legislativa al crear el Colegio no se limitó a asegurar que la profesión médico veterinaria gozara de profesionales competentes y cualificados sino que, además, procuró adelantar y salvaguardar la salud del Pueblo a través del desarrollo técnico de la ciencia veterinaria a nivel intelectual y cultural.

No cabe duda de que la propuesta de la colegiación compulsoria, que se promulgó mediante la Ley Núm. 107-1986, persigue un interés apremiante por parte del Estado.

Habiendo establecido que el Estado persigue un interés apremiante de salud pública, debemos evaluar si el Estado tenía a su alcance medidas menos onerosas para lograr el interés articulado. El Tribunal de Apelaciones dispuso —utilizando un enfoque errado— que la Junta Examinadora era la opción menos onerosa para salvaguardar el interés apremiante del Estado en regular la profesión.[11] Ello, debido a que la Junta Examinadora tiene la facultad de realizar las funciones necesarias para asegurar y mantener los altos estándares en la profesión de los médicos veterinarios.[12]

---

[11] Véase, *Sentencia del Tribunal de Apelaciones*, Apéndice de la Apelación, pág. 1181. El error estriba en que el foro intermedio identificó un interés apremiante erróneo. La colegiación compulsoria no persigue un interés de 'regular la profesión', sino, más bien, de adelantar la salud pública y lo que ello envuelve.

[12] Íd.

La cuestión de umbral para revisar este criterio es determinar cómo los intereses del Estado están mejor servidos. Para ello hay que identificar los deberes y obligaciones de la Junta Examinadora *vis a vis* los del Colegio, así como su alcance.

Por una parte, la Junta Examinadora se creó para "promover la salud, seguridad y bienestar público mediante la protección del [P]ueblo contra la práctica impropia de la medicina veterinaria". Véase, Exposición de Motivos de la Ley Núm. 194-1979, supra. Ante ello, la legislatura le otorgó la función primordial de observar y filtrar las cualidades y aptitudes necesarias de los y las aspirantes a ejercer la veterinaria.

Nótese que a siete años de la creación de la Junta Examinadora, la legislatura creó el Colegio para conferirle deberes y obligaciones específicos que no había delegado a la Junta Examinadora. El propósito fue robustecer la clase médico-veterinaria y mejorar la calidad de la salud pública en la Isla. Véase, Exposición de Motivos, Ley Núm. 107-1986.

En específico, el Colegio tiene a su alcance deberes y obligaciones distintas a la Junta Examinadora. Las **funciones del Colegio persiguen desarrollar la profesión médico-veterinaria más allá de las aptitudes y cualidades intelectuales para pertenecer a la profesión. La participación del Colegio en la discusión de asuntos públicos trasciende a su matrícula e incide sobre la salud comunitaria.** Obsérvese que "la función de los colegios

profesionales es servir de vehículo apropiado para canalizar de forma efectiva los esfuerzos colectivos de las profesiones para beneficio de la comunidad". García v. Col. Arq. de P.R., 144 DPR 921, 924 (1998) (Opinión Concurrente del entonces Juez Asociado Hernández Denton).

**La Junta Examinadora no está facultada por ley a desarrollar un sinnúmero de gestiones que garantizan el mejoramiento de la salud pública.** Por ejemplo, es al Colegio a quien se le confirió la facultad de contribuir al adelanto y desarrollo de la ciencia y el arte de la medicina veterinaria así como a laborar por la implantación de leyes adecuadas para la profesión.

Además, el Colegio tiene un rol crucial velar por la salud del Pueblo como la encargada, por mandato expreso de la Ley Núm. 107-1986, de aprobar el código de ética que regirá a clase médico-veterinaria. El Colegio es la entidad encargada de recibir e investigar las quejas juradas que se formulen respecto a la conducta de los y las miembros de la clase médico-veterinaria para ser referida a posible sanción disciplinaria por parte de la Junta Examinadora. 20 LPRA 2971d.

Con este cuadro, el entorno salubrista y las circunstancias históricas en las que vivimos validan que el Colegio es una entidad necesaria que requiere la colegiación compulsoria para llevar a cabo su labor de forma efectiva. Como se indicó, este fomenta la creación de actividades educativas y preventivas en pro de la salud pública tales

como la vacunación o esterilizaciones en masa; redacta de proyectos de ley; conduce investigaciones sobre enfermedades y avances de la ciencia; efectúa investigaciones de las quejas que se insten en contra de los y las médicos veterinarios; crea los procedimientos que la clase médico-veterinaria ha de observar a la hora de vacunar a animales; regula el contenido del certificado de vacunación de un animal; sirve de enlace entre la agencia federal de *Food and Drug Administration* ante la escasez de medicamentos, entre otros.[13]

La Junta Examinadora, por su parte, tiene una función muy limitada, a saber: atiende los procedimientos relacionados a emitir, renovar, denegar, suspender y revocar licencias permanentes y provisionales para el ejercicio de la medicina veterinario en Puerto Rico, así como tomar medidas disciplinarias, en relación con los y las tenedores de estas licencias. En cambio, el Colegio tiene otras competencias para garantizar el mejor funcionamiento de la profesión y, por ende, cumplir con el fin de salud pública propuesto. En consecuencia, el Colegio es la medida menos onerosa para lograr los intereses inherentes a su creación.

Es errónea la conclusión, a la cual llegan algunos miembros de este Tribunal, que la Junta Examinadora es el medio menos oneroso para cumplir con un interés para el que no está habilitada. Además, si la Asamblea Legislativa así

---

[13] Véase, *Apelación*, págs. 19-24.

lo hubiese querido, hubiese otorgado a la Junta Examinadora esas facultades y no habría promulgado posteriormente la ley que faculta la colegiación compulsoria.

La realidad es que la Junta Examinadora no cuenta con las herramientas para adelantar la salud pública como lo hace el Colegio. El análisis constitucional nos exige que la medida sea la menos onerosa, **siempre y cuando adelante el interés del Estado**. Como vimos, el interés del Estado con la colegiación compulsoria de los médicos veterinarios no se limita a regular la profesión para mantener estándares altos. El Estado busca proteger la salud del Pueblo supervisando la salud de los animales y aprovechando los avances tecnológicos para el desarrollo de la profesión. Al no identificar un medio alterno al Colegio que realmente pueda cumplir con sus propósitos, no se podía decretar la inconstitucionalidad de la Ley Núm. 107-1986.

La función esencial de la clase médico-veterinaria y su papel de diagnosticar, pronosticar, tratar y prevenir las enfermedades que afectan a los animales —tanto domésticos, exóticos, salvajes y ganaderos— es de la más alta envergadura. **Es por ello que el ejercicio del derecho a no asociarse debe ceder ante el interés del colectivo.**

Estimo que la salud pública es razón de peso suficiente para mantener la colegiación compulsoria de la clase médico-veterinaria.

**III**

En fin, se perdió otra oportunidad para atender de manera ponderada las controversias sobre el derecho a la libre asociación y los parámetros adjudicativos al abordar planteamientos constitucionales. Los casos que atienden la colegiación compulsoria de las distintas profesiones ameritan resolverse según sus circunstancias. El uso de métodos generalizados disasociados de sus características distintivas conllevan una aplicación errada y mecánica como en Rivera Schatz v. Colegio de Abogados, *supra*, cuyos hechos y derechos enfrentados son distinguibles de este caso.

De manera singular, este caso, que atañe directamente a la salud pública, debió ser objeto de un enfoque más abarcador. La profesión de la clase médico-veterinaria supera el ejercicio de velar por la salud de los animales domésticos. Su labor involucra el cuidado de los animales que las personas consumen y evita la propagación de enfermedades. El valor de la colegiación compulsoria y la labor neurálgica del Colegio ameritaban un trato y una respuesta diferente de nuestra parte. Penosamente, ello no fue así y, por ello, disiento.


                                   Maite D. Oronoz Rodríguez
                                   Jueza Presidenta